**No. 23-1083**

# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

===

**TIMOTHY FINLEY,**
*Plaintiff-Appellant,*

*v.*

**ERICA HUSS, et al,**
*Defendants-Appellees.*

===

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
CASE NO. 2:18-CV-00100

===

## APPELLANT'S OPENING BRIEF

===

| RODERICK & SOLANGE MACARTHUR JUSTICE CENTER | UCLA SCHOOL OF LAW PRISONERS' RIGHTS CLINIC |
|---|---|
| DANIEL M. GREENFIELD* | AARON LITTMAN** |
| 501 H STREET NE, STE. 275 | 385 CHARLES E. YOUNG DRIVE E |
| WASHINGTON, D.C. 20002 | LOS ANGELES, CALIFORNIA 90095 |
| (202) 869-1664 | (310) 825-9562 |

COUNSEL FOR PLAINTIFF-APPELLANT
**Timothy Finley**

\* Admitted to the bar of this Court and that of Illinois. Admission pending to the bar of DC.
\*\* This brief was prepared with the assistance of UCLA School of Law Prisoners' Rights Clinic students Anna Norkett and Kathryn Rosenfeld.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This appeal involves complex questions of Eighth and Fourteenth Amendment and disability-rights law, as well as of qualified immunity. Because oral argument would materially advance this Court's resolution of these issues, Appellant requests that it be granted.

## STATEMENT OF RELATED CASES

Finley filed a complaint against the above-named defendants raising materially the same claims in the Western District of Michigan in 2016. *Finley v. Huss*, Case No. 2:16-cv-00253 (W.D. Mich.). When that action was dismissed, he appealed to this Court, Case No. 17-1566 (6th Cir.), which reversed and remanded, 723 F. App'x 294 (6th Cir. 2018). Rather than amending his complaint, Finley voluntarily dismissed that action without prejudice and refiled the present case in 2018. *Finley v. Huss*, Case No. 2:18-cv-00100 (W.D. Mich.).

## DISCLOSURES OF CORPORATE AFFILIATION AND FINANCIAL INTEREST

Pursuant to Sixth Circuit R. 26.1, Appellant Timothy Finley makes the following disclosures:

Is said party a subsidiary or affiliate of a publicly owned corporation? **No.**

Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? **No.**

i

**TABLE OF CONTENTS**

STATEMENT IN SUPPORT OF ORAL ARGUMENT ......................................... i

STATEMENT OF RELATED CASES.................................................................. i

DISCLOSURES OF CORPORATE AFFILIATION AND FINANCIAL INTEREST....................................................................................................... i

TABLE OF AUTHORITIES .........................................................................v

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION..................................................................3

STATEMENT OF ISSUES ...........................................................................3

STATEMENT OF THE CASE.........................................................................5

   I.   Timothy Finley, a Michigan state prisoner with a long history of serious mental illness, was known to be at risk of self-harm from the day he arrived at Marquette Branch Prison. ..............................................................5

   II.   Finley's mental illness caused him to injure himself. He repeatedly cut himself, overdosed on medication, and swallowed razor blades. Defendants responded by placing him in solitary confinement. .......................................6

      A. Finley swallowed a razor blade on September 1. Doctors were unable to remove it, so it remained lodged in his throat. ..............................................6

      B. Finley continued to harm himself in solitary. ...............................................8

      C. Finley swallowed the second documented razor blade on September 18....8

      D. After being classified to indefinite solitary confinement, Finley swallowed a third documented razor blade.................................................................9

      E. After being airlifted to a hospital for removal of multiple razor blades, Finley—still suicidal—was reclassified to indefinite solitary confinement. ........................................................................................10

   III.  Defendants knew that Finley's severe mental illness caused him to injure himself, and that placing him in solitary confinement would likely exacerbate his illness. ..............................................................................................11

      A. Finley repeatedly alerted MBP correctional and mental health staff of his severe mental illness and its manifestations and sought intensive mental health treatment.......................................................................................11

B. MBP staff repeatedly alerted defendants that Finley was at serious risk of injuring himself, that it was unsafe to allow him access to razor blades, and that it was unsafe to place him in solitary confinement. ...........................12

C. Huss acknowledged that she knew Finley was unable to tolerate solitary confinement and should not be placed there. Schroeder admitted to knowing about Finley's self-injurious behavior. .......................................14

IV. Finley was subjected to extreme isolation in a "Base level" solitary confinement cell.................................................................................................14

V. Defendants classified Finley to administrative segregation on two occasions without providing notice and a meaningful opportunity for him to contest the placement, and without considering its impacts on his mental health or the views of mental health professionals.............................................................16

VI. Procedural History .......................................................................................19

SUMMARY OF THE ARGUMENT ....................................................................21

STANDARD OF REVIEW ...................................................................................23

ARGUMENT .........................................................................................................23

I. The district court correctly found that Finley's evidence sufficed to establish both objective and subjective deliberate indifference. ..................................23

A. "Voluminous evidence" of Finley's self-harm and suicidal behavior establishes an objectively substantial risk of harm from placement in solitary confinement. ..........................................................................24

B. Salmi's assessments and Finley's history of self-harm establish defendants' subjective awareness of the substantial risk of harm from placement in solitary confinement. ..........................................................................24

II. Defendants are not entitled to qualified immunity on Finley's Eighth Amendment claims. ........................................................................................27

A. The right at issue was clearly established when defendants placed Finley in solitary confinement. .........................................................................28

B. Defendants should also be denied qualified immunity under the obvious violation doctrine. .................................................................................37

III. Defendants are not entitled to summary judgment on Finley's procedural due process claim because he did not receive the process due for the atypical and significant hardship he suffered.....................................................................39

iii

A. Finley had a liberty interest in avoiding placement in solitary confinement. ...................................................................................................39

B. Finley did not receive the process due. ..................................................43

C. Defendants are not entitled to qualified immunity on Finley's procedural due process claim. .................................................................................48

IV. Defendants are not entitled to summary judgment on Finley's ADA claims because they discriminated against him on the basis of his mental disability and failed to accommodate it when they confined him in administrative segregation. ............................................................................................49

A. Defendants intentionally discriminated against Finley based on his mental disability when they classified him to solitary confinement because of behavior attributable to it. .......................................................................50

B. Even if the *McDonnell Douglas* burden-shifting framework were to apply, defendants' currently asserted reason for keeping Finley in administrative segregation—keeping him away from razor blades—is pretextual. .........53

C. Defendants failed to reasonably accommodate Finley's mental disability when they failed to move him into mental health treatment or to mitigate the severity of his solitary confinement. ..................................................55

CONCLUSION ...............................................................................................57

CERTIFICATE OF COMPLIANCE ...................................................................59

CERTIFICATE OF SERVICE ..........................................................................60

ADDENDUM .................................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apodaca v. Raemisch*,
139 S. Ct. 5 (2018) (statement of Sotomayor, J., respecting denial
of certiorari) ...................................................................................33

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011).........................................................................29

*Austin v. Wilkinson*,
372 F.3d 346 (6th Cir. 2004) .....................................................39, 40

*Barker v. Goodrich*,
649 F.3d 428 (6th Cir. 2011) ...........................................................28

*Beers-Capitol v. Whetzel*,
256 F.3d 120 (3d Cir. 2001) ............................................................32

*Braggs v. Dunn*,
257 F. Supp. 3d 1171 (M.D. Ala. 2017).......................................35, 46

*Burnett v. Griffith*,
33 F.4th 907 (6th Cir. 2022) ............................................................37

*Caldwell v. Moore*,
968 F.2d 595 (6th Cir. 1992) ...........................................................29

*Estate of Carter v. City of Detroit*,
408 F.3d 305 (6th Cir. 2005) ...........................................................30

*Casey v. Lewis*,
834 F. Supp. 1477 (D. Ariz. 1993) ...................................................36

*Clark v. Coupe*,
55 F.4th 167 (3d Cir. 2022) .............................................................34

*Coleman v. Wilson*,
912 F. Supp. 1282 (E.D. Cal. 1995) .................................................36

*Comstock v. McCrary*,
273 F.3d 693 (6th Cir. 2001) ..............................................................................31

*Coulson v. The Goodyear Tire & Rubber Co.*,
31 F. App'x 851 (6th Cir. 2002)...........................................................................50

*Cummings v. City of Akron*,
418 F.3d 676 (6th Cir. 2005) ...............................................................................27

*D.C. v. Wesby*,
138 S. Ct. 577 (2018)...........................................................................................29

*Darrah v. Krisher*,
865 F.3d 361 (6th Cir. 2017) ..........................................................................29, 30

*Davenport v. DeRobertis*,
844 F.2d 1310 (7th Cir. 1988) ........................................................................34, 35

*Davis v. Ayala*,
576 U.S. 257 (2015) (Kennedy, J., concurring) ....................................................33

*Estate of DiMarco v. Wyo. Dep't of Corr.*,
473 F.3d 1334 (10th Cir. 2007) ...........................................................................40

*Dominguez v. Corr. Med. Servs.*,
555 F.3d 543 (6th Cir. 2009) ..........................................................................28, 30

*Douglas v. Muzzin*,
No. 21-2801, 2022 WL 3088240 (6th Cir. Aug. 3, 2022)...................................56

*Equal Emp. Opportunity Comm'n v. Dolgencorp*,
899 F.3d 428 (6th Cir. 2018) ...............................................................................51

*Farmer v. Brennan*,
511 U.S. 825 (1994)........................................................................................23, 24

*Finley v. Huss*,
723 F. App'x 294 (6th Cir. 2018)..................................................................*passim*

*Fisher v. Nissan N. Am., Inc.*,
951 F.3d 409 (6th Cir. 2020) ...................................................................50, 51, 55

vi

*Furman v. Georgia*,
408 U.S. 238 (1972) (Douglas, J., concurring)....................................................33

*Gates v. Collier*,
501 F.2d 1291 (5th Cir. 1974) ............................................................................34

*Glossip v. Gross*,
576 U.S. 863 (2015) (Breyer, J., dissenting) ......................................................33

*Graham v. Connor*,
490 U.S. 386 (1989)............................................................................................28

*Harden-Bey v. Rutter*,
524 F.3d 789 (6th Cir. 2008) ..............................................................................39

*Harvard v. Inch*,
411 F. Supp. 3d 1220 (N.D. Fla. 2019) ..............................................................57

*Hedrick v. W. Reserve Care Sys.*,
355 F.3d 444 (6th Cir. 2004) ..............................................................................50

*Helfin v. Stewart Cnty., Tenn.*,
958 F.2d 709 (6th Cir. 1992) ..............................................................................29

*Hernandez v. Mesa*,
137 S. Ct. 2003 (2017)........................................................................................29

*Hewitt v. Helms*,
459 U.S. 460 (1983)..............................................................................43, 44, 45

*Hope v. Pelzer*,
536 U.S. 730 (2002)....................................................................................37, 38

*Hudson v. McMillian*,
503 U.S. 1 (1992)................................................................................................23

*Incumaa v. Stirling*,
791 F.3d 517 (4th Cir. 2015) ..............................................................................47

*Ingram v. Clements*,
705 F. App'x 721 (10th Cir. 2017)......................................................................56

vii

*Isby v. Brown*,
856 F.3d 508 (7th Cir. 2017) ...................................................................47

*J.H. v. Williamson Cnty.*,
951 F.3d 709 (6th Cir. 2020) ..................................................................41

*Jones 'El v. Berge*,
164 F. Supp. 2d 1096 (W.D. Wis. 2001) .................................................35

*Keenan v. Hall*,
83 F.3d 1083 (9th Cir. 1996) ..................................................................34

*Kent v. Oakland Cnty.*,
810 F.3d 384 (6th Cir. 2016) ..................................................................27

*Knox Cnty., Tenn v. M.Q.*,
62 F.4th 978 (6th Cir. 2023) .............................................................49, 55

*Langley v. Coughlin*,
715 F. Supp. 522 (S.D.N.Y. 1988) .........................................................36

*LaReau v. MacDougall*,
473 F.2d 974 (2d Cir. 1972) ...................................................................35

*Latson v. Clarke*,
249 F. Supp. 3d 838 (W.D. Va. 2017)..........................................36, 51, 52

*Lewis v. Humboldt Acquisition Corp.*,
681 F.3d 312 (6th Cir. 2012) (en banc) .............................................49, 53

*Lopez v. Wetzel*,
No. 3:21-cv-1819, 2022 WL 17340629 (M.D. Pa. Nov. 30, 2022) ...................36

*Madrid v. Gomez*,
889 F. Supp. 1146 (N.D. Cal. 1995)........................................................35

*Mathews v. Eldridge*,
424 U.S. 319 (1976)................................................................................46

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)................................................................................23

*McDonnell Douglas v. Green*,
411 U.S. 792 (1973)..................................................................50, 54

*McKee v. Turner*,
124 F.3d 198 (6th Cir. 1997) .............................................................31

*In re Medley*,
134 U.S. 160 (1890)..........................................................................33

*Palakovic v. Wetzel*,
854 F.3d (3d Cir. 2017) .....................................................................35

*Partridge v. Smith*,
No. 17-cv-02941, 2019 WL 8370781 (D. Colo. Dec. 3, 2019).........57

*Patterson v. Mintzes*,
717 F.2d 284 (6th Cir. 1983) ............................................................42

*Phillips v. Roane Cnty., Tenn.*,
534 F.3d 531 (6th Cir. 2008) ............................................................27

*Plumhoff v. Rickard*,
572 U.S. 765 (2014)..........................................................................29

*Porter v. Clarke*,
923 F.3d 348 (4th Cir. 2019) ............................................................35

*Powell v. Washington*,
720 F. App'x 222 (6th Cir. 2017) ................................................43, 45

*Quigley v. Tuong Vinh Thai*,
707 F.3d 675 (6th Cir. 2013) .................................................28, 30, 31

*Rafferty v. Trumbull Cnty., Ohio*,
915 F.3d 1087 (6th Cir. 2019) ...............................................21, 30, 31

*Ramos v. Quiros*,
No. 3:11-cv-1616, 2012 WL 4501673 (D. Conn. Sept. 27, 2012) .....57

*Rinehart v. Weitzell*,
964 F.3d 684 (8th Cir. 2020) ............................................................56

*Robertson v. Contra Costa Cnty.*,
 No. 15-cv-02549, 2016 WL 4259135 (N.D. Cal. Aug. 12, 2016)......................52

*Robinson v. California*,
 370 U.S. 660 (1962) (Douglas, J., concurring).....................................................33

*Robinson v. Cuyahoga Cnty.*,
 No. 1:22-cv-0961, 2022 WL 16793347 (N.D. Ohio, Nov. 8, 2022).................51

*Roell v. Hamilton Cnty.*,
 870 F.3d 471 (6th Cir. 2017) ...............................................................................49

*Ruiz v. Johnson*,
 37 F. Supp. 2d 855 (S.D. Tex. 1999)....................................................................35

*Sandin v. Conner*,
 515 U.S. 472 (1995)................................................................................................39

*Selby v. Caruso*,
 734 F.3d 554 (6th Cir. 2013) .........................................................................44, 47

*Serrano v. Francis*,
 345 F.3d 1071 (9th Cir. 2003) ..............................................................................40

*Smith v. Collins*,
 964 F.3d 264 (4th Cir. 2020) ................................................................................43

*Spain v. Procunier*,
 600 F.2d 189 (9th Cir. 1979) .........................................................................34, 42

*Spann v. Lombardi*,
 65 F.4th 987 (8th Cir. 2023) .................................................................................48

*Taylor v. Riojas*,
 141 S. Ct. 52 (2020)........................................................................................37, 38

*Tchankpa v. Ascena Retail Grp., Inc.*,
 951 F.3d 805 (6th Cir. 2020) ................................................................................50

*Thompson v. Washington*,
 No. 1:21-cv-683, 2022 WL 2128264 (W.D. Mich., June 14, 2022) .................51

x

*Thorpe v. Clarke*,
　37 F.4th 926 (4th Cir. 2002) ..................................................................32, 48

*Thorpe v. Virginia Dep't of Corr.*,
　No. 2:20-cv-00007, 2020 WL 10354128 (W.D. Va. Sept. 4, 2020) ..................57

*Townsend v. Cooper*,
　759 F.3d 679 (7th Cir. 2014) ..................................................................40, 41, 42

*Trs. of Resilient Floor Decorators Ins. Fund v. A&M Installations, Inc.*,
　395 F.3d 244 (6th Cir. 2005) ....................................................................23

*Wade v. Montgomery Cnty.*,
　No. 4:17-cv-1040, 2017 WL 7058237 (S.D. Tex. Dec. 6, 2017)......................57

*Walker v. Benjamin*,
　293 F.3d 1030 (7th Cir. 2002) ..................................................................32

*Walker v. Mintzes*,
　771 F.2d 920 (6th Cir. 1985) ....................................................................42

*Walker v. Shansky*,
　28 F.3d 666 (7th Cir. 1994) ......................................................................34

*Wayne v. Vill. of Sebring*,
　36 F.3d 517 (6th Cir. 1994) ......................................................................28

*Wheeler v. Butler*,
　209 F. App'x 14 (2d Cir. 2006) ................................................................40

*Wilkinson v. Austin*,
　545 U.S. 209 (2005)...................................................................41, 42, 44, 46

*Williams v. Sec'y Pa. Dep't of Corr.*,
　848 F.3d 549 (3d Cir. 2017) ....................................................................43

*Wyatt v. Nissan N. Am., Inc.*,
　999 F.3d 400 (6th Cir. 2021) ....................................................................54

**Statutes**

42 U.S.C.A. § 12102 ....................................................................................49

**Other Authorities**

Fed. R. Civ. P. 56(c)..........................................................................23

## INTRODUCTION

At Marquette Branch Prison, over a period of several months, Timothy Finley experienced the worst mental health crisis of his life. He repeatedly cut himself with razor blades that prison staff allowed him to access. He then swallowed the razors, necessitating several emergency surgeries to remove blades embedded in his esophagus and stomach. Throughout this time, his mental health provider repeatedly offered straightforward instructions for keeping him safe, telling prison officials to do three things: first, provide him intensive mental health treatment; second, prevent him from obtaining razor blades; and third, avoid placing him in solitary confinement, which would worsen his condition.

Defendants, two deputy wardens, did the opposite. Instead of admitting him to one of multiple available mental health treatment programs, they allowed staff to permit him access to razor blades. When he swallowed them, defendants placed Finley in the prison's most extreme form of indefinite solitary confinement, a "Base level" cell. There—deprived of all natural light, unable to hear the sound of another human voice, and rarely able to exercise—they left him.

Although he continued to swallow razor blades, injuring himself so severely that he had to be airlifted to a hospital, they rubber-stamped his ongoing assignment to solitary confinement. At his classification hearings, defendants failed to consider his mental illness—in violation of prison policy. One hearing was conducted in

absentia. Only after he filed a lawsuit was Finley finally transfered from solitary confinement to an intensive mental healthcare program.

Defendants' decisions to confine Finley in an extreme form of indefinite solitary confinement despite being repeatedly warned that it was likely to exacerbate his ongoing mental health crisis violated clearly established Eighth Amendment law. Their failure to provide him notice of classification hearings, the opportunity to attend one of them, and meaningful periodic reviews violated his right to due process under clearly established Fourteenth Amendment law. And their decision to place him in solitary confinement for behavior caused by his mental illness, and failure to provide reasonable accomodations, amounted to disability discrimination.

The first time this Court heard Finley's case (and reversed its dismissal), it recognized the gravity of his mistreatment, likening defendants' actions to leaving a prisoner who is "hemorrhaging" to bleed out with nothing but a "band-aid," and to "taking away [the] crutches" of someone with a "broken leg." *Finley v. Huss*, 723 F. App'x 294, 298 (6th Cir. 2018). Finley's evidentiary presentation has only strengthened his case. The district court's grant of summary judgment should be reversed and this case remanded for trial.

2

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983. Final judgment was entered on December 30, 2022; notice of appeal was timely filed on January 27, 2023. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether the district court correctly recognized that "voluminous" evidence of his self-harm and suicidal behavior established an objectively substantial risk of harm from solitary confinement, and that this evidence, as well as a prison mental health provider's repeated warnings, established defendants' subjective awareness of the risk.

2.    Whether the district court erred in granting defendants qualified immunity on Finley's Eighth Amendment claim, ignoring binding precedent clearly establishing that prison officials may not ignore known risks of harm, ignoring a consensus that solitary confinement of those with serious mental illness causes grave harm and therefore violates the Constitution, and rejecting Finley's argument that defendants' violations of his rights were obvious.

3.    Whether the district court erred in finding that Finley lacked a liberty interest in avoiding placement in solitary confinement, failing to consider the profoundly different impact it has on prisoners with serious mental illness, and overlooking the Supreme Court's recognition that indefinite solitary confinement

3

with limited out-of-cell time and no ability to communicate with other prisoners poses an atypical and significant hardship.

4. Whether the district court erred in finding that Finley received due process during his first classification hearing and periodic reviews, but correctly found that he was denied due process in his second classification hearing, when the hearings were conducted without notice or input from mental health providers and the reviews were perfunctory.

5. Whether the district court erred in granting defendants qualified immunity on Finley's procedural due process claim when prisoners facing assignment to administrative segregation have clearly established rights to notice, the opportunity to be heard, and meaningful review.

6. Whether the district court erred in granting defendants summary judgment on Finley's Americans with Disabilities Act claims when their documented reason for putting Finley in solitary confinement was behavior resulting directly from his serious mental illness—and therefore constituted direct evidence of intentional discrimination—and when their failure to remove Finley from solitary confinement or modify its extreme constituted a failure to reasonably accommodate his disability.

4

## STATEMENT OF THE CASE

**I.      Timothy Finley, a Michigan state prisoner with a long history of serious mental illness, was known to be at risk of self-harm from the day he arrived at Marquette Branch Prison.**

Timothy Finley has had severe mental illness since he was 11 or 12 years old. (Kupers Decl., R.88-2, PageID.594.) He has been diagnosed with bipolar and major depressive disorders, among others. (*Id.*) By the time he first entered prison, at 17, he had been admitted to inpatient psychiatric hospitals six times and made multiple suicide attempts. (*Id.*) After entering custody, he attempted to hang himself twice prior to May 2016. (Med. Recs., R.88-5, PageID.739.)

As soon as Finley arrived at Marquette Branch Prison (MBP) on May 25, 2016, he was classified to a treatment program designed for those with a mental health diagnosis and in need of mental healthcare. (Corr. Recs., R.88-6, PageID.747-748.) Finley was assigned to mental health professional (MHP) Mandi Salmi, who was familiar with him from a previous stint at MBP. (Salmi Dep., R.88-7, PageID.778.) Salmi assessed him to be at "moderate risk of suicide or self-injury." (*Id.*) Accordingly, Finley's mental health management plan notified staff that he should not be allowed access to razors or other sharp objects. (*Id.* at PageID.779.)

Finley remained in the mental health treatment program until June 27, when he was transferred to general population. (Corr. Recs., R.88-6, PageID.747-748.)

5

**II.      Finley's mental illness caused him to injure himself. He repeatedly cut himself, overdosed on medication, and swallowed razor blades. Defendants responded by placing him in solitary confinement.**

Beginning on August 30, Finley hit a mental health "breaking point" and alerted MBP staff that he was thinking of harming himself. (Finley Dep., R.88-4, PageID.684.) He was transferred to a suicide observation cell, where he was to be under "constant supervision" and not to have access to razor blades.[1] (Med. Recs., R.88-5, PageID.719-720.) Within 15 minutes, however, prison officials permitted Finley to gain access to a razor and cut himself four times. (*Id.*; Pacholke Decl., R.88-3, PageID.659-660.) The next afternoon, he was seen "writing on walls with his blood." (Med. Recs., R.88-5, PageID.721.)

**A.      Finley swallowed a razor blade on September 1. Doctors were unable to remove it, so it remained lodged in his throat.**

Even though Finley was observed by prison staff every fifteen minutes and was writing on the walls with blood from his wounds, no one removed the blade or otherwise intervened. (Med. Recs., R.88-5, PageID.720-724l; Finley Dep., R.88-4, PageID.684-686.) Over two days, Finley continued to cut himself, approximately 20 times in total. At one point, a nurse came to Finley's cell and told him: "Look, they're

---

[1]Defendants shuttled Finley between suicide observation and administrative segregation cells as he decompensated. (Corr. Recs., R.88-6, PageID.747.) Both, however, constitute solitary confinement. Prisoners in observation cells, generally allowed only a gown and blanket, are "even more isolated, idle, and uncomfortable" than those in segregation. (Kupers Decl., R.88-2, PageID.617-618.)

watching you on control center and they said if you keep cutting yourself they're going to tie you to the bunk." (Finley Dep., R.88-4, PageID.686.) But at no point did staff remove the razor. Then, on September 1, he swallowed the blade. (*Id.*) It became lodged in his throat, causing "esophageal bleed." (Med. Recs., R.88-5, PageID.725.) That day, Finley was transferred to Marquette General Hospital, but doctors were unable to remove the razor. (*Id.* at PageID.727.)

After returning to MBP with the blade still embedded, Finley continued to be held in the suicide observation cell. (Finley Dep., R.88-4, PageID.688.) Following his return from the hospital, he was "sitting there spitting up blood, losing sleep, not eating well, complaining, screaming, begging for help. [He] lost [his] voice." (*Id.* at PageID.688.) After several days, Finley was sent back to Marquette General Hospital, but doctors were again unable to remove the razor. (Med. Recs., R.88-5, PageID.727.)

Upon his return to MBP on September 6, Finley asked Salmi to be admitted to the outpatient Interim Care Program (ICP). (Finley Dep., R.88-4, PageID.689.) Psychiatrist Dr. Rome and Unit Manager Paul Eyke also thought he needed a higher level of mental healthcare; both suggested referral to the inpatient Residential Treatment Program. (*Id.*) Though Finley and his providers believed he required intensive treatment, he was not referred to either program. (*Id.*)

### B. Finley continued to harm himself in solitary.

On September 8, the day after being moved from observation to general population, Finley received his first misconduct violation since arriving at MBP, for having metal parts to fix a television. (Corr. Recs., R.88-6, PageID.761-762, 1147, 1341, 1152-53; Finley Dep., R.88-4, PageID.690.) Because of this violation, Finley was placed in segregation, which immediately triggered self-harm. (Corr. Recs., R.88-6, PageID.747-748; Med. Recs., R.88-5, PageID.728.) Using a razor he brought from general population, which prison staff did not take from him, Finley reopened his wounds; he wrote "DEATH" on the wall in blood and told Salmi he was thinking of hanging himself. (Med. Recs., R.88-5, PageID.728; Finley Dep., R.88-4, PageID.691.) Salmi determined Finley was at risk of suicide and documented this. (Med Recs., R.88-5, PageID.729.)

Finley was then moved to an observation cell, where he remained for the next nine days. (Corr. Recs., R.88-6, PageID.747-748.) Again, he repeatedly cut himself, overdosed on prescription heart medication, and swallowed multiple additional (albeit less clearly documented) razors—sometimes in the immediate presence of MBP staff. (Med Recs., R.88-5, PageID.729; Finley Dep., R.88-4, PageID.693-694.)

### C. Finley swallowed the second documented razor blade on September 18.

Finley was transferred to general population on September 17, though he remained without privileges. (Corr. Recs., R.88-6, PageID.747-748, 760.) There, a

correctional officer provided Finley a razor blade, even though Salmi had filed at least six mental health management plans, each calling for "[n]o razors." (*Id*. at 752-753; Med. Recs., R.88-5, PageID.720, 729, 731, 733, 736, 738.)

Finley cut himself and ingested another razor blade on September 18. (Finley Dep., R.88-4, PageID.694.) After he swallowed it, Finley was given a Class I misconduct charge for possessing the razor. (Corr. Recs., R.88-6, PageID.751; Finley Dep., R.88-4, PageID.695.) Finley spent three days in a suicide observation cell with the blade in his throat before being transferred to Marquette General Hospital, where doctors were able to remove the newly ingested razor as well as those already in his stomach, but not the one which had been lodged in his throat for over two weeks. (Corr. Recs., R.88-6, PageID.747-748; Finley Dep., R.88-4, PageID.694.) Finley was referred the same day to Escanaba Hospital, where doctors attempted unsuccessfully to remove that blade. (Finley Dep., R.88-4, PageID.696.)

### D.   After being classified to indefinite solitary confinement, Finley swallowed a third documented razor blade.

After returning from this failed surgery, Finley was placed in a suicide observation cell. (Corr. Recs., R.88-6, PageID.747-748.) In disregard of Salmi's written warnings that solitary confinement would worsen his mental health crisis and without considering alternatives, Huss classified Finley to indefinite solitary confinement on September 27. (Corr. Recs., R.88-6, PageID.754; Salmi Dep., R.88-7, PageID.783.) Within hours thereafter, Finley cut himself, overdosed on pills

9

prescribed for his tachycardia, and swallowed yet another blade. (Med. Recs., R.88-5, PageID.732-734.) He was evaluated the next day and again assessed to be at moderate risk of suicide or self-injury. (Hares Dep., R.88-8, PageID.801-802.)

Finley complained of abdominal pain and vomited blood. (Med. Recs., R.88-5, PageID.734; Finley Dep., R.88-4, PageID.699.) He was airlifted to the University of Michigan hospital on September 29, where he underwent successful surgery that finally removed the first razor from his throat, as well as the last razor from his stomach. (Corr. Recs. 1121-23; Med. Recs., R.88-5, PageID.735; Kupers Decl., R.88-2, PageID.604; Finley Dep., R.88-4, PageID.699.) This was his fourth hospitalization in as many weeks.

> **E.    After being airlifted to a hospital for removal of multiple razor blades, Finley—still suicidal—was reclassified to indefinite solitary confinement.**

Following his discharge from the hospital on October 5, Finley refused to come to his cell door to cuff up, resulting in a misconduct charge for disobeying a direct order. (Pacholke Decl., R.88-3, PageID.665; Finley Dep., R.88-4, PageID.700.) Finley told prison staff he wanted to kill himself; he was restrained and forcibly medicated with injected antipsychotic. (Med. Recs., R.88-5, PageID.737.) Rather than send Finley to receive intensive mental healthcare, defendants kept him in a suicide observation cell for 19 days. (Corr. Recs., R.88-6, PageID.747-748.) He was then placed back in indefinite administrative segregation

10

following another SCC hearing on October 10, led this time by Schroeder. (Corr. Recs., R.88-6, PageID.747-748; Schroeder Dep., R.88-10, PageID.824-826, 831.)

**III.      Defendants knew that Finley's severe mental illness caused him to injure himself, and that placing him in solitary confinement would likely exacerbate his illness.**

        **A.      Finley repeatedly alerted MBP correctional and mental health staff of his severe mental illness and its manifestations and sought intensive mental health treatment.**

Finley alerted MBP staff of—and they documented—his thoughts of self-harm starting on August 30. (Med. Recs., R.88-5, PageID.719-720.) That same day, he told staff that he was "frustrated that he is not getting appropriate mental health treatment." (*Id.* at PageID.721.) The next day, he reported "'cutting' on his arm . . . to 'feel better.'" (*Id.* at PageID.723). He also communicated his distress in "writing[,] on walls with his blood." (*Id.* at PageID.721.)

Upon his return to MBP on September 6—following the first failed surgery—Finley asked Salmi to be admitted to the ICP. (Finley Dep., R.88-4, PageID.689.) He hid neither his thoughts nor his acts of self-harm. Two days later, Salmi reported that Finley told her he was "thinking about hanging himself." (Med. Recs., R.88-5, PageID.728.) In the immediate presence of MBP staff, Finley cut himself, overdosed on pills, and swallowed razors. (Finley Dep., R.88-4, PageID.693-694.)

Finley also expressly tied his behavior to his mental illness. When written up for swallowing the second razor, Finley asserted he was not guilty, saying, "I have

11

a mental illness." (Med. Recs., R.88-5, PageID.749.) Finley asked not to be punished, writing: "I suffer from a major mental illness, bipolar and major depression, and one of the things that is part of my illness is self-mutilation. These things I have no control over." (Corr. Recs., R.88-6, PageID.752.)

### B. MBP staff repeatedly alerted defendants that Finley was at serious risk of injuring himself, that it was unsafe to allow him access to razor blades, and that it was unsafe to place him in solitary confinement.

According to MDOC policy, mental health management plans are to be completed by MHPs and their "recommendations are to be implemented." (Med. Recs., R.88-5, PageID.738.) Salmi conducted mental health evaluations on August 30, September 8, 20, and 28, and October 5 and 6, each time documenting that Finley was at risk of suicide and should not have access to razor blades. (Med. Recs., R.88-5, PageID.728-729, 731, 733, 736, 738.) These forms included lines for the signatures of the deputy warden or designee. *Id.*

Salmi also completed Misconduct Sanction Assessments for the four violations Finley received in September; per policy, these were "[to] be used to assist in determining appropriate sanctions to be imposed if the prisoner is found guilty of major misconduct." (Corr. Recs., R.88-6, PageID.750.) She warned on each that Finley was on the mental health caseload and that "prolonged segregation placement is likely to deteriorate his mental health." (*Id.* at PageID.750, 763, 766, 768.)

12

Per MDOC policy, prisoners on the mental health caseload are not to be placed in administrative segregation unless an MHP is first consulted to "determine if the prisoner's mental health needs or limitations can be met in administrative segregation." (Segregation Policy, R.88-14, PageID.854.) Further, MDOC policy requires that if a prisoner is being reclassified for a Class I misconduct such as possession of a razor blade, the classification committee—including defendants, as deputy wardens—must review the Misconduct Sanction Assessment and consider the prisoner's need for mental health services in determining whether administrative segregation is the most appropriate placement. *Id.*

Salmi emailed Schroeder on October 27 to reiterate that Finley's treatment needs could not be met in solitary confinement and seek his release to the ICP. (Salmi Dep., R.88-7, PageID.784.) On October 31, Schroeder responded, *agreeing* with the recommendation but failing to act on it.[2] (Corr. Recs., R.88-6, PageID.677, 758.) MDOC policy required that Finley be transferred to alternative housing within three days of a mental health recommendation, but he was not released to the ICP for 77 days, until after he had filed a lawsuit seeking release from solitary

---

[2] Although Schroeder asserts that Finley was placed on the waiting list for outpatient mental healthcare that same day, she did not effectuate his removal from solitary confinement for several months. (Schroeder Dep., R.88-10, PageID.827.) Schroeder met weekly to discuss moving prisoners up the waitlist for outpatient mental healthcare, but never moved Finley up the waitlist. (*Id.*).

13

confinement. (Corr. Recs., R.88-6, PageID.747-748; Disabled Policy, R.88-13, PageID.851.)

> **C.    Huss acknowledged that she knew Finley was unable to tolerate solitary confinement and should not be placed there. Schroeder admitted to knowing about Finley's self-injurious behavior.**

After a classification hearing on September 14 for a misconduct violation on September 8, Huss came to Finley's cell and told him, "Look, I'm not putting you in segregation. I'm letting you go back to GP." (Finley Dep., R.88-4, PageID.698.) When Finley replied, saying, "I appreciate it because you know I can't stand being in seg," Huss said, "I know, so I'm going to let you go back out to GP." (*Id.*) Despite agreeing that Finley's mental illness made it inappropriate to place him in solitary confinement, Huss did so anyway, only 13 days later. (Corr. Recs., R.88-6, PageID.754.)

Schroeder, for her part, admits that even before stepping into her role as Acting Deputy Warden in Huss's absence, she knew that Finley had been engaging in self-injurious behavior, including while in solitary confinement. (Schroeder Dep., R.88-10, PageID.824.)

## IV.    Finley was subjected to extreme isolation in a "Base level" solitary confinement cell.

Finley spent most of his time in solitary confinement in a cell on the tier known as the "Base level" because it was on the bottom floor of the prison and had

14

no windows. (Pacholke Decl., R.88-3, PageID.673.) It was akin to a basement. Finley was unable to communicate with other people because the prison used industrial fans to drown out the sound of speech. (*Id.* at PageID.674.) His meals were passed through a door port; he ate them where he slept and defecated. (Finley Dep., R.88-4, PageID.704.) Finley described being "entombed." (*Id.*)

Normally, prisoners in administrative segregation are entitled to an hour of out-of-cell time, five days per week. (Guidebook, R.88-15, PageID.858.) During the 79 days Finley was confined there, however, he got out-of-cell time on just eight days.[3] (Calendar, R.88-16, PageID.864-875.) He could only shower three times per week; most weeks, these were the only occasions he left his cell. (Finley Dep., R.88-4, PageID.704, Guidebook, R.88-15, PageID.857-858.) Each time Finley went to shower, he was strip searched. (*Id.*)

Finley was barred from using the telephone, except for legal calls and in case of emergency. (Guidebook, R.88-15, PageID.858.) He was allowed only two specific books per month from the library and had to request legal materials by citation. (*Id.* at PageID.861, Finley Dep., R.88-4, PageID.705.) Finley had no access

---

[3] Finley was denied access to the out-of-cell time normally allowed to people in administrative segregation because his privileges had been revoked due to misconduct charges. (Finley Dep., R.88-4, PageID.703.)

15

to classes, congregate recreation, or television. (Finley Dep. R.88-4, PageID.705.) He had no access to therapy. (Salmi Dep., R.88-7, PageID.786.)

While in solitary confinement, Finley experienced mental and emotional anguish, insomnia, anxiety, decompensation, and inability to concentrate. (Finley Dep., R.88-4, PageID.706.) He slept only two and a half hours per day. (*Id.* at PageID.707.) When first moved to solitary confinement, Finley lost 20 pounds in nine days. (Kupers Decl., R.88-2, PageID.620.) Dr. Terry Kupers, a psychiatrist and expert on correctional mental health who evaluated Finley in connection with this case, diagnosed him with post-traumatic stress disorder resulting in part from his placement in solitary confinement. (*Id.* at PageID.612.)

| V. | **Defendants classified Finley to administrative segregation on two occasions without providing notice and a meaningful opportunity for him to contest the placement, and without considering its impacts on his mental health or the views of mental health professionals.** |
|---|---|

A Security Classification Committee ("SCC") was convened twice, in September and October, to decide whether Finley should be classified to administrative segregation. (Corr. Recs., R.88-6, PageID.754; Schroeder Dep., R.88-10, PageID.825-826, 831.) Each SCC consisted of the deputy warden, the unit manager, and an MHP. (*Id.*) Both times, the SCC classified Finley to administrative segregation. (*Id.*) Penology expert and former corrections officer Dan Pacholke opined that there was no meaningful consideration of Finley's mental health at either

16

classification hearing, with the outcome "predetermined based upon the finding of guilt at the misconduct hearing." (Pacholke Decl., R.88-3, PageID.666.)

The September SCC hearing was triggered only by a finding that Finley was guilty of possessing a razor blade. (Corr. Recs., R.88-6, PageID.754.) The committee consisted of Huss, the unit manager, and MHP Hares. (*Id.*) Hares was not Finley's assigned MHP. (Hares Dep., R.88-8, PageID.806.) Finley learned of the SCC hearing when he was brought to it, leaving him unable to develop a challenge to the reclassification. (Finley Dep., R.88-4, PageID.709.)

Huss and the SCC did not follow MDOC policies requiring consideration of mental health implications when classifying Finley to administrative segregation in September. *See supra* Section III.B. Hares testified that MHPs are not allowed to give their views on the appropriate housing for a mentally ill prisoner during these hearings, and can only do so during an appeal. (Hares Dep., R.88-8, PageID.803, 805; *see also* Salmi Dep., R.88-7, PageID.784-785.) This is directly contrary to written policy. (Segregation Policy, R.88-14, PageID.1054.) Huss left the section of the SCC form "to be completed if the prisoner is receiving outpatient mental health services" completely blank. (Huss Dep., R.88-9, PageID.816.) She testified that she never fills out that section. (*Id.*)

Huss completed only two sections of the form, other than Finley's basic information and signatures. (Corr. Recs., R.88-6, PageID.754.) In the section that

17

stated "We have reviewed the above misconducts, and if applicable, the Misconduct Sanction Assessment . . . and reclassify the prisoner to administrative segregation because the misconducts:" Huss checked the box that stated: "Demonstrate an inability to be managed with general population privileges."[4] (*Id.*) Huss testified that she reviewed Salmi's Misconduct Sanction Assessment form, which advised that segregation was likely to deteriorate Finley's mental health. (Huss Dep., R.88-9; PageID.816.) Nonetheless, and with no discussion, Huss classified Finley to indefinite administrative segregation.

The October hearing, triggered by Finley's failure to follow a direct order, was similar to the September hearing but led by Schroeder. (Schroeder Dep., R.88-10, PageID.831.) However, unlike the September hearing, Finley was not permitted to attend. (Finley Dep., R.88-4, PageID.711.) Schroeder too left blank the section of the SCC form asking whether his mental health needs could be met in segregation, and she checked the same box. (Schroeder Dep., R.88-10, PageID.831.) MHP Hares was again present but said nothing. (*Id.* at PageID.826.) Schroeder acknowledged

---

[4] After this lawsuit was filed, Huss asserted in her deposition and summary judgment briefing that she had other reasons for classifying Finley to administrative segregation, including previous misconduct and his "potential to honor the trust implicit in a lower level of security." (MSJ, R.84, PageID.343.) The only reasons given contemporaneously were those listed on the SCC form: possession of a razor blade and inability to be managed with general population privileges. (Corr. Recs., R.88-6, PageID.754.) To the extent alternative, post-hoc justifications are credible, they create disputes of fact to be resolved at trial.

18

during her deposition that she could have asked the MHP whether alternative housing would be appropriate but did not do so. (*Id.*) Schroeder again classified Finley to indefinite administrative segregation. (*Id.* at PageID.831.)

Schroeder was supposed to periodically review Finley's continued placement in administrative segregation. She filled out a "Segregation Behavior Review" form weekly until November 2016. (Corr. Recs., R.88-6, PageID.770-775.) She completed the forms identically until the final review, writing in the section titled "Nature of What Led to Segregation Placement/Reason for Continuance/Expectations" only that Finley "was found to be in possession of a razor blade," and indicated no reason for continuance or how Finley could be released. (*Id.*) Even though Finley was not charged with another misconduct while in administrative segregation, Schroeder repeatedly recommended that his placement continue. (*Id.*)

## VI.    Procedural History

Finley filed a pro se complaint against defendants in the Western District of Michigan. (R&R, R.100, PageID.1591.) The district court dismissed at screening, concluding that he had failed to state Eighth Amendment and Fourteenth Amendment claims. (*Id.*) Finley appealed; this Court vacated and remanded. *Finley*, 723 F.App'x at 299. The decision did not address the procedural due process or disability-discrimination claims because the district court had not meaningfully

19

considered them. *Id.* However, Judge Daughtrey filed a concurring opinion, stating that she would hold that Finley had adequately alleged "serious" Fourteenth Amendment and ADA violations. *Id.* (Daughtrey, J., concurring).

Finley voluntarily dismissed the earlier action and filed a new one, stating the same claims. (R&R, R.100, PageID.1592.) Defendants sought summary judgment. (*Id.*) The magistrate judge recommended that it be granted on all claims. (R&R, R.100, PageID.1591.) The district court adopted the report and recommendation in its entirety. (Order, R.113, PageID.1721.)

The district court found that genuine issues of material fact existed as to Finley's Eighth Amendment claim. (R&R, R.100, PageID.1597.) Despite finding "voluminous" evidence that defendants were deliberately indifferent by placing Finley in conditions they knew were likely to deteriorate his mental health, the district court granted qualified immunity on the Eighth Amendment claim. (R&R, R.100, PageID.1629.) The district court also found that placement of Finley in solitary confinement did not implicate a liberty interest, disregarding the implications of extreme isolation for someone with serious mental illness. (R&R, R.100, PageID.1611.) The district court rejected Finley's ADA claim, applying the *McDonnell-Douglas* burden shifting framework based on a determination that defendants' proffered reasons for placing him in solitary confinement were indirect evidence of disability discrimination. (R&R, R.100, PageID.1619.) It did not

consider Finley's reasonable accommodation claim, finding that there can only be failure to accommodate when there is intentional discrimination. (R&R, R.100, PageID.1623.)

## SUMMARY OF THE ARGUMENT

1.    As the district court correctly found, there is "voluminous evidence" of both objective and subjective deliberate indifference. (R&R, R.100, PageID.1600.) Defendants own admissions show they were aware of and disregarded a substantial risk of serious harm to Finley by placing him in solitary confinement in the midst of a mental health crisis.

2.    It was clearly established in 2016 that it violates the Eighth Amendment to place a mentally ill person in solitary confinement, without need and with the knowledge that it would be detrimental to him. The Sixth Circuit has recently confirmed that "it was clearly established in 2014 that ignoring known risks of harm to an inmate due to . . . inhumane conditions of confinement could constitute deliberate indifference," and that defining the right at this level of generality is appropriate. *Rafferty v. Trumbull Cnty., Ohio*, 915 F.3d 1087, 1097 (6th Cir. 2019). Furthermore, several circuits had held that conditions of indefinite solitary akin to his violated the Eighth Amendment, and numerous courts had concluded that placing prisoners with serious mental illness in solitary was unconstitutional. Finally, qualified immunity should be denied under the obvious violation doctrine.

21

3.    Finley had a protected liberty interest in avoiding placement in the restrictive solitary confinement conditions at MBP. Compared to the conditions experienced by a significant portion of the prison population, placement in indefinite solitary confinement in a "Base level" cell, with no natural light, no ability to communicate with others, and very little exercise was an atypical and significant hardship. Finley was especially vulnerable to these conditions because of his severe mental illness.

4.    Finley did not receive adequate process when assigned to indefinite administrative segregation. He received notice of neither classification hearing and was not allowed to attend one of them. Finley was denied due process when the classification committee failed to invite or take into account input from mental health providers—contrary to prison policy. The periodic reviews of Finley's classification were perfunctory shams.

5.    Binding precedent clearly established Finley's procedural due process rights to notice, opportunity to be heard, and meaningful periodic reviews.

6.    Defendants intentionally discriminated against Finley when they placed him in solitary confinement based on behaviors—swallowing a razor blade and failing to come to his cell door while suicidal—that were the result of his mental disability. Defendants likewise failed to make reasonable accommodations when

22

they failed to move him out of administrative segregation and into a mental health treatment program or to mitigate solitary confinement's harmful effects.

## STANDARD OF REVIEW

Grants of summary judgment are reviewed de novo. *Trs. of Resilient Floor Decorators Ins. Fund v. A&M Installations, Inc.*, 395 F.3d 244, 247-48 (6th Cir. 2005). Summary judgment is proper when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). This Court must construe all reasonable inferences in favor of the nonmoving party—here, Finley. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

I.    **The district court correctly found that Finley's evidence sufficed to establish both objective and subjective deliberate indifference.**

To establish deliberate indifference, a plaintiff must show he was incarcerated under conditions posing an objectively substantial risk of serious harm and that the defendant was subjectively aware of that risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). This inquiry is "responsive to 'contemporary standards of decency.'" *Hudson v. McMillian*, 503 U.S. 1, 2 (1992) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). To satisfy the subjective inquiry, he must show that the defendant was aware of facts from which one could infer a substantial risk of serious

23

harm, drew the inference, and acted in disregard of it. *Farmer*, 511 U.S. at 837. Finley's evidence easily satisfies both.

### A.    "Voluminous evidence" of Finley's self-harm and suicidal behavior establishes an objectively substantial risk of harm from placement in solitary confinement.

The district court correctly found "voluminous evidence of self-harm and suicidal behavior," sufficient to satisfy the objective prong. (R&R, R.100, PageID.1600.) Finley was rushed to the emergency room after swallowing a razor blade even before defendants placed him in administrative segregation; this "alone," the district court found, created a genuine issue of fact. (*Id.*) Beyond this, the district court pointed to further evidence: "Finley's diagnosed mental illnesses, his history of self-mutilation (particularly while in administrative segregation), and QMHP Salmi's recommendation against prolonged time in administrative segregation." (R&R, R.100; PageID.1606.)

### B.    Salmi's assessments and Finley's history of self-harm establish defendants' subjective awareness of the substantial risk of harm from placement in solitary confinement.

The district court correctly concluded that Finley offered evidence sufficient to show both that defendants were aware of the substantial risk of serious harm and that they were deliberately indifferent to it. (R&R, R.100, PageID.1600.) *See Farmer*, 511 U.S. at 837. This was hardly a stretch: the Sixth Circuit had previously concluded that several of Finley's allegations, if true, made it "obvious" that

24

defendants were subjectively deliberately indifferent. *Finley*, 723 F. App'x at 298. All of the alleged facts upon which this Court's conclusion relied have been robustly supported by Finley's evidence; indeed, only one—defendants' violation of prison policies—is even plausibly in dispute. *Id.*

### 1.    Defendants were aware of the substantial risk of serious harm.

The district court found both Huss's and Schroeder's own depositions to create triable issues as to whether they knew of the serious risk that placing Finley in solitary confinement would pose to his mental health. (R&R, R.100, PageID.1601-1603.) Huss admitted that she reviewed Salmi's warnings before placing Finley in segregation. (Huss Dep., R.88-9, PageID.815-816.) Moreover, 12 days before the September SCC hearing, Huss told Finley that she knew he would be unable to tolerate solitary confinement. (Finley Dep., R.88-4, PageID.698.) In Schroeder's deposition, she admitted that when she presided over his second SCC hearing, she knew his self-injurious behavior while in solitary confinement had necessitated an airlift for emergency surgery. (Schroeder Dep., R.88-10, PageID.824-825.)

The record is replete with additional evidence that both defendants were on notice of the manifestations of Finley's mental illness, including emails from staff alerting them that he had swallowed razors and notifications that he had been placed

25

on suicide watch at least thirteen times in 2016. (*See* MSJ Opp., R.88, PageID.561-562.)

### 2.    Defendants were deliberately indifferent to the risk.

As the district court concluded, Finley presented evidence sufficient to establish that defendants drew the inference that placing him in solitary would harm his health and did so anyway. (R&R, R.100, PageID.1605.) Although defendants dispute that they understood that Finley's mental illness put him at risk of harm in solitary confinement, (MSJ, R.84, PageID.350), his previous self-injurious behavior, while on medical observation status and in administrative segregation, as well as Salmi's specific warnings on several Misconduct Sanction Assessment forms are more than adequate to create a genuine dispute of material fact. As the district court pointed out, defendants ignored the risk immediately after it was realized. (R&R, R.100, PageID.1607-1608.)

Defendants' disregard of prison policies designed to protect mentally ill prisoners from the risks posed by solitary confinement offers further evidence of their subjective deliberate indifference. *See Finley*, 723 F. App'x at 298 (citing *Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009)). In an email to Schroeder, Salmi reminded her of a policy requiring "transfer of prisoners out of segregation following receipt of [an MHP's] recommendation . . . 'as soon as possible but no later than three business days after receipt of the recommendation.'"

26

(Emails, R.88-18, PageID.887.) Finley was not transferred until 77 days after receipt.

Defendants also ignored the policy requiring that they consider Misconduct Sanction Assessments, such as the those in which Salmi warned that segregation would cause Finley's mental health to deteriorate, and consider alternatives. (Segregation Policy, R.88-14, PageID.854.) Instead, defendants conducted SCC proceedings without asking for input from MHPs. *See id.*

## II.   Defendants are not entitled to qualified immunity on Finley's Eighth Amendment claims.

Qualified immunity should be denied when a defendant has violated a plaintiff's constitutional right, and that right was clearly established. *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 538-39 (6th Cir. 2008). For a right to be clearly established, the plaintiff need not present a case with "materially similar" facts; rather, the court asks whether defendants had "fair warning" that their actions were unconstitutional. *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (citations omitted).

The law is clearly established when the plaintiff can point either to "cases of controlling authority in his jurisdiction at the time of the incident," or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Kent v. Oakland Cnty.*, 810 F.3d 384, 395 (6th Cir. 2016) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). Decisions of

27

the Supreme Court, this Court, and other circuits are all relevant. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 684 (6th Cir. 2013); *see also Barker v. Goodrich*, 649 F.3d 428, 436 (6th Cir. 2011) (even non-authoritative precedent "can provide defendants with fair warning"). As little as one controlling case can suffice. *See Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 552 (6th Cir. 2009). Administrative policy can bolster the conclusion that a right is clearly established. *Wayne v. Vill. of Sebring*, 36 F.3d 517, 531 (6th Cir. 1994).

The analysis under the first prong overlaps with the foregoing discussion of the substantive violation and hence is not repeated. (R&R, R.100, PageID.1627.)

> **A.   The right at issue was clearly established when defendants placed Finley in solitary confinement.**
>
> **1.   Existing Eighth Amendment caselaw need not present a close factual match in order to clearly establish a right, because—unlike in the Fourth Amendment context—defendants have the opportunity to deliberate before being indifferent.**

Qualified immunity arises predominantly in cases involving either the Fourth or Eighth Amendment—the "two primary sources of constitutional protection against physically abusive governmental conduct." *Graham v. Connor*, 490 U.S. 386, 394 (1989).

In Fourth Amendment cases, courts considering whether a right is clearly established have required caselaw presenting a close factual match, to ensure that the "unlawfulness of the officer's conduct" follows "immediately" from the

28

description of the established right. *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). Policing often involves split-second decisions; qualified immunity gives officials "breathing room" to make "reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). When snap judgments must be made, few facts are known to officers; they have little time to understand the circumstances, their options, and the constitutionality of alternatives. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017). And in cases involving "grave public safety risk[s]," officers should be encouraged to act decisively. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014).

By contrast, the Sixth Circuit and its sisters accept a higher level of generality in precedent clearly establishing Eighth Amendment law. *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992). For example, in *Helfin v. Stewart Cnty., Tenn.*, this Court relied on the Supreme Court's decision in *Estelle v. Gamble*, about treatment for a work-related back injury, to hold that detainees had a clearly established right to receive care for the serious medical needs. 958 F.2d 709, 717 (6th Cir. 1992), *on reconsideration*, 968 F.2d 1 (6th Cir. 1992). A right defined at this level of generality sufficed to defeat qualified immunity in a case about a prisoner who hung himself and was neither cut down nor resuscitated by staff. *Id.*; *see also Darrah v. Krisher*, 865 F.3d 361, 374 (6th Cir. 2017) (general prohibition on deliberate indifference to serious medical needs clearly established that continuing to prescribe dermatologic

29

medication recognized as less effective than alternative could violate Constitution); *Quigley*, 707 F.3d at 684-85 (general prohibition clearly established that prescribing medications with known dangerous interaction could violate Constitution, and observing that although "there is no federal case directly on point[,] [this] does not undermine this conclusion"); *Dominguez v. Corr. Med. Serv.*, 555 F.3d 543, 552 (6th Cir. 2009) (decision involving deliberate indifference to chest pain clearly established right in case about heat stroke); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) (decision about delay in cutting down hanging prisoner clearly established right in case about risk of heart attack).

Finley's case illustrates well why a close factual match is unnecessary. As in other Sixth Circuit cases countenancing a higher level of generality, *see Krisher*, 865 F.3d at 370 (plaintiff visited defendants "numerous times" over three-month period); *Rafferty*, 915 F.3d at 1091 (four to six encounters with defendants over three-month period), his interactions with defendants spanned numerous encounters over multiple months, giving them plenty of time to consider the lawfulness of their actions. In fact, Huss had the opportunity to assess whether putting Finley in solitary was appropriate—*and to decide against it*—prior to his first SCC hearing on September 27. Moreover, Finley posed no safety or security risk to anyone else. (Pacholke Decl., R.88-3, PageID.667.)

30

**2.** **The Sixth Circuit and Supreme Court have repeatedly held that defendants violate the Eighth Amendment when they are alerted that placing a prisoner in certain conditions will impose a substantial risk of serious harm and do it anyway.**

By 2016, it was clearly established that "ignoring known risks of harm to an inmate due to . . . inhumane conditions of confinement" would rise to the level of an Eighth Amendment violation. *Rafferty*, 915 F.3d at 1097 (citing *Estelle*, 429 U.S. at 103-04; *Krisher*, 865 F.3d at 367; *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); and *Villegas v. Metro. Gov't*, 709 F.3d 563, 571 (6th Cir. 2013)). As this Court has previously explained, once serious risks of harm are *known* to a prison official, "it would not make any sense to permit [the] prison official who deliberately ignored [them] to claim that it would not have been apparent to a reasonable person that such actions violated the law." *McKee v. Turner*, 124 F.3d 198 (6th Cir. 1997); *see Quigley,* 707 F.3d at 685 (denying qualified immunity based on clearly established law that prison medical providers "cannot *consciously* expose a patient to an excessive risk of serious harm while providing medical treatment" (emphasis added)); *Comstock v. McCrary*, 273 F.3d 693, 702, 707 (6th Cir. 2001) (although prisoners did not have clearly established right to be screened for suicidality, "we have long held that prison officials who have been *alerted* to a prisoner's serious medical needs are under an obligation to offer medical care," such that defendant who knew prisoner "might inflict harm on himself" and ignored that risk was denied

31

qualified immunity (emphasis added)); *see also Thorpe v. Clarke*, 37 F.4th 926, 933-34 & n.3 (4th Cir. 2002) (denying qualified immunity in solitary confinement case because "qualified immunity does not protect *knowing* violations of the law"); *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

Again, defendants here ignored the *known* risks that solitary confinement would be deleterious to Finley's health based on Salmi's four Misconduct Sanction Assessments as well as Finley's prior self-injurious behavior in solitary. (Corr. Recs., R.88-6, PageID.750, 763, 766, 768.) Indeed, Schroeder even *agreed* with Salmi's recommendation that Finley's needs could not be met in administrative segregation and that he needed to be transferred to a mental health treatment program; this required her, under prison policy, to effectuate the transfer within three business days. *See Finley*, 723 F. App'x at 297. Instead, Finley was left to languish. Defendants "*consciously*" exposed Finley to an excessive risk of serious harm; they were "*alerted*" that classification to and continuation of solitary confinement would endanger him and did it anyway. These actions violated clearly established law.

### 3. Even the right as defined by the district court—a right of mentally ill prisoners not to be placed into administrative segregation—was clearly established.

The district court found that the correct framing of the issue was "whether, at the time of the defendants' conduct, it was clearly established that a mentally ill

prisoner had a right to not be placed into administrative segregation." (R&R, R.100, PageID.1627.) Though this right is defined too narrowly, a consensus of case law and other persuasive authority holds that placing a seriously mentally ill prisoner in extreme and indefinite solitary confinement violates the Eighth Amendment.

The Supreme Court has for decades understood that solitary confinement can constitute cruel and unusual punishment. Over a century before Finley's case arose, the Court recognized its grave psychiatric impacts. *In re Medley*, 134 U.S. 160, 168 (1890); *see also Robinson v. California*, 370 U.S. 660, 668 (1962) (Douglas, J., concurring); *Furman v. Georgia*, 408 U.S. 238, 245 (1972) (Douglas, J., concurring). More recently, Justice Kennedy remarked that the "human toll wrought by extended terms of isolation long has been understood" and that even for prisoners sentenced to death, solitary confinement is "a further terror and peculiar mark of infamy." *Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring). Justice Breyer observed that "the United Nations Special Rapporteur on Torture has called for a global ban on solitary confinement longer than 15 days" and that solitary confinement can produce "numerous deleterious harms." *Glossip v. Gross*, 576 U.S. 863, 926 (2015) (Breyer, J., dissenting). And Justice Sotomayor described solitary confinement as "perilously close to a penal tomb." *Apodaca v. Raemisch*, 139 S. Ct. 5, 10 (2018) (statement of Sotomayor, J., respecting denial of certiorari).

For many years, several of this Court's sister circuits have held that even relatively short stints of solitary confinement can violate the Eighth Amendment under some circumstances—particularly in cases involving paltry out-of-cell time. *See Davenport v. DeRobertis*, 844 F.2d 1310, 1311-13 (7th Cir. 1988) (90 days in solitary confinement with 3 hours out-of-cell time weekly); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (outdoor exercise of less than five hours weekly); *Gates v. Collier*, 501 F.2d 1291, 1305 (5th Cir. 1974) (more than 24 hours in "dark hole" without cleaning supplies, bedding, or adequate food or heat); *see also Keenan v. Hall*, 83 F.3d 1083, 1089-91 (9th Cir. 1996) (year in solitary with excessive noise, constant illumination, poor ventilation and sanitation); *Walker v. Shansky*, 28 F.3d 666, 668-69, 673 (7th Cir. 1994) (ten months in solitary confinement with additional deprivations).

Meanwhile, numerous courts have held that placing those with serious mental illness in solitary confinement constitutes cruel and unusual punishment. As the Third Circuit recently explained in denying qualified immunity, there was as of 2016 a "robust consensus of decisions specifically addressing the constitutionality of assigning mentally ill prisoners to solitary confinement." *Clark v. Coupe*, 55 F.4th 167, 186 (3d Cir. 2022). This juridical consensus is founded in turn upon a "scientific consensus" that solitary confinement, "even over relatively short periods," causes severe psychological harm even to those not already mentally ill and especially to

those who are. *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019); *see also Palakovic v. Wetzel*, 854 F.3d at 209, 225-26 (3d Cir. 2017) (allegations that prisoner with serious mental illness had served "multiple 30-day stints in solitary confinement" were "more than sufficient" to state Eighth Amendment claim given "increasingly obvious reality" that such isolation causes "devastating mental health consequences"); *Davenport*, 844 F.2d at 1311-13 ("[I]solating a human being from other human beings year after year or even month after month can cause substantial psychological damage[.]"); *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972) (Eighth Amendment violated where seven-day assignment to strip cell "threaten[ed] an inmate's sanity and sever[ed] his contacts with reality").

As one district court observed several decades ago, placing prisoners with a "history of prior psychiatric problems" in solitary confinement is "the mental equivalent of putting an asthmatic in a place with little air to breathe." *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995); *see also Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1247 (M.D. Ala. 2017) ("[I]t is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances," and even then only with the agreement of mental health providers.); *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1101-02, 1116–25 (W.D. Wis. 2001) (granting preliminary injunction on claim that housing mentally ill prisoners in solitary violates Eighth Amendment); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D.

35

Tex. 1999) ("[A]dministrative segregation is being utilized unconstitutionally to house mentally ill inmates-inmates whose illness can only be exacerbated by the depravity of their confinement."), *rev'd and remanded on other grounds sub nom. Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001); *Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (unconstitutional to place prisoners with mental illness in solitary "because such placement will cause further decompensation"); *Casey v. Lewis*, 834 F. Supp. 1477, 1549-50 (D. Ariz. 1993) (placement of seriously mentally ill prisoners in segregated housing for "more than three days . . . despite [defendants'] knowledge that [it] is not suitable for self-abusive inmates" constitutes "appalling" Eighth Amendment violation); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1988) (triable Eighth Amendment issue when defendants classified to solitary "those individuals who, by virtue of their mental conditions, are likely to be severely and adversely affected by placement there"); *see also Lopez v. Wetzel*, No. 3:21-cv-1819, 2022 WL 17340629, at *6 (M.D. Pa. Nov. 30, 2022) ("[F]urther impair[ing] the fragile psyches" of prisoners with known "serious mental health needs" by "wantonly subjecting them to solitary confinement without penological justification" violated their clearly established Eighth Amendment rights.); *Latson v. Clarke*, 249 F. Supp. 3d 838, 867 (W.D. Va. 2017) (recognizing mentally disabled prisoner's clearly established right not to be deprived of "mental health and sanity," including by placement in administrative segregation for over one month).

36

Finally, MBP regulations requiring consideration of mental health in classification decisions and removal within three days of a mental health provider's recommendation "buttress[]" the conclusion that a reasonable deputy warden would have known placing Finley in solitary confinement was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 744-45 (2002) (ostensibly protective regulation was "merely a sham"). This conclusion is likewise supported by penology expert Pacholke's observation that standards issued by the U.S. Department of Justice, the American Correctional Association, and the Association of State Correctional Administrators all proscribe placement of prisoners with serious mental illness in restrictive housing except in emergency circumstances or if such placement is assessed by a mental health provider to be safe and appropriate. *See id.* (DOJ report "condemning the practice" put defendants on notice). (Pacholke Decl., R.88-3, PageID.672.)

### B. Defendants should also be denied qualified immunity under the obvious violation doctrine.

When the conduct of a prison official is "so egregious that a constitutional violation is apparent," the Supreme Court does not require existing caselaw to satisfy the 'clearly established' prong of the qualified-immunity analysis. *Burnett v. Griffith*, 33 F.4th 907, 914 (6th Cir. 2022)). In cases like this one, "any reasonable officer" should realize his or her actions are unconstitutional. *Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020). (Suppl. Br., R.110, PageID.1701-1704.)

37

The District Court incorrectly found that this case does not fall within the "obvious violation doctrine," suggesting that "there is ample evidence in the record as to why Defendant would have believed their conduct to be justified." (Order, R.113, PageID.1720; R&R, R.100, PageID.1629.) However, the instant case is more like *Taylor*—a recent case in which the Supreme Court applied the obvious violation doctrine—than the District Court believed.

*Taylor* held that an official's act is an obvious violation when the conduct is gratuitously harmful and unnecessary due to the availability of alternatives. The Court found it significant that "the conditions of [the plaintiff's] confinement were [not] compelled by necessity or exigency." 141 S. Ct. at 54; *see also Hope v. Pelzer*, 536 U.S. 730, 738 (gratuitous suffering inflicted despite lack of exigency). Here, too, there was no exigency that precipitated Finley's solitary confinement. He was not a risk to anyone but himself, and placing him in solitary confinement was neither necessary nor sufficient to protect him, since he was allowed access to razor blades in general population, in observation, and in administrative segregation. Further, the record in *Taylor* did not "reveal any reason to suspect that the conditions of [the plaintiff's] confinement could not have been mitigated, either in degree or duration"—true in Finley's case as well. 141 S. Ct. at 54. When filling out the classification forms, defendants left blank the portions asking for alternatives considered. Neither could state which alternatives—if any—she considered. (Huss

38

Dep., R.88-9, PageID.818; Schroeder Dep., R.88-10, PageID.826.) Indeed, safe and humane alternatives—the mental health treatment programs in which mental health providers repeatedly sought to place him—were available.

**III.    Defendants are not entitled to summary judgment on Finley's procedural due process claim because he did not receive the process due for the atypical and significant hardship he suffered.**

> **A.    Finley had a liberty interest in avoiding placement in solitary confinement.**

A prisoner is entitled to the protections of due process when deprived of a liberty interest—that is, when a deprivation imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Whether conditions impose an atypical and significant hardship is determined in relation to the ordinary conditions experienced by a significant portion of the prison population. *Austin v. Wilkinson*, 372 F.3d 346, 355 (6th Cir. 2004). Courts consider both the "nature of the more-restrictive confinement and its duration in relation to prison norms." *Harden-Bey v. Rutter*, 524 F.3d 789 (6th Cir. 2008) (emphasis removed).

> **1.    The vulnerabilities of prisoners should be considered in determining whether a hardship is atypical and significant.**

The consensus of this Court's sister circuits is that a prisoner's vulnerabilities to certain conditions are relevant in assessing whether they impose an atypical and significant hardship. The Second, Seventh, Ninth, and Tenth Circuits—the only ones

39

to have squarely considered the issue—have all so held, in cases addressing both physical and psychological vulnerabilities. Contrary to the district court's conclusion, the Sixth Circuit has never spoken squarely to this issue. *Austin*, which it cites, stands for the proposition that the "baseline" reference of "ordinary conditions" is assessed globally and not individually; it nowhere says that how "atypical and significant" a hardship is in relation to that baseline does not depend on individual vulnerabilities. 372 F.3d at 355. (R&R, R.100, PageID.1610-1611.)

In the decision most directly on point, the Seventh Circuit held that the isolative and harsh conditions the plaintiff experienced in solitary confinement— *combined* with how these conditions affected his already severe mental illness— "easily" established an atypical and significant hardship. *Townsend v. Cooper*, 759 F.3d 679, 686 (7th Cir. 2014). In a case upon which this Court has previously relied, *Serrano v. Francis*, the Ninth Circuit held that solitary confinement imposed an atypical and significant hardship on a wheelchair-using plaintiff when his cell was not wheelchair accessible. 345 F.3d 1071, 1079 (9th Cir. 2003) ("[T]he conditions imposed on Serrano in the SHU, *by virtue of his disability*, constituted an atypical and significant hardship on him[.]" (emphasis added)); *see also Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334 (10th Cir. 2007) (considering transgender woman's gender identity when assessing existence of atypical and significant hardship); *Wheeler v. Butler*, 209 F. App'x 14, 16 (2d Cir. 2006) (remanding for

40

consideration of how plaintiff's hearing impairment and lack of hearing aids in solitary confinement impacted atypical-and-significant-hardship analysis).

This Court's own precedent in the substantive due process context also strongly supports considering individual characteristics. In *J.H. v. Williamson Cnty.*, the Sixth Circuit held that because the plaintiff was "uniquely vulnerable to the harmful effects of solitary confinement . . . his placement in segregation was [] particularly harsh." 951 F.3d 709, 719 (6th Cir. 2020). Mental illness "must be relevant to our analysis," it explained; "a court [cannot] pretend that the effects of solitary confinement are the same regardless of a detainee's mental health status." *Id.* at 720 n.2. Given the well-recognized and severe psychological impacts of solitary confinement on people with mental illness,[5] this Court should consider this characteristic in its analysis.

### 2. The conditions in Finley's "Base level" cell imposed an atypical and significant hardship, and he was uniquely vulnerable to them due to his mental illness.

Finley was subjected to solitary confinement that was both extreme in nature and indefinite in duration. In *Wilkinson v. Austin*, the Supreme Court found that similar conditions imposed an atypical and significant hardship. 545 U.S. 209, 224

---

[5] Dr. Kupers explained that there is an evolving consensus in corrections that prisoners suffering from serious mental illness, such as bipolar disorder, should not be placed in solitary confinement. (Kupers Decl., R.88-2, PageID.625.) Solitary confinement conditions exacerbate mental illness, worsen prognoses, and greatly increase the risk of suicide. *Id.*

(2005). The Court reasoned that the conditions—constant lighting, prohibition of human contact including cell-to-cell conversation, and a single hour of exercise per day—and the indefinite duration of the placement created a liberty interest. *Id.* at 223-24. Finley's "Base level" cell likewise gave him no access to sunlight and left him in total isolation, with no ability to communicate with other prisoners. His conditions were in fact more extreme than those in *Wilkinson*, because he was denied all privileges, meaning he had no access to recreation and no exercise during many of the weeks he was held in administrative segregation. *See Patterson v. Mintzes*, 717 F.2d 284, 289 (6th Cir. 1983); *Walker v. Mintzes*, 771 F.2d 920, 927-28 (6th Cir. 1985); *see also Spain*, 600 F.2d at 199. His term in solitary confinement was likewise indefinite.

These conditions would have imposed an atypical and significant hardship on any prisoner, but their impact was substantially worse for someone with a serious mental illness. When the Seventh Circuit found that the plaintiff's solitary confinement "easily" satisfied the atypical-and-significant-hardship standard in *Townsend*, the court pointed both to his conditions, including denial of privileges, and to their effects on his mental health: he experienced heart palpitations, feared he was about to die, and wrote "help me" in blood on his cell wall. 759 F.3d at 686. When defendants placed Finley in solitary confinement, the effect of similar

42

conditions on his mental health was even more severe: he swallowed razors. Just like the plaintiff in *Townsend*, he wrote a message in blood.

*Powell* v. *Washington*, the unpublished case on which the district court relied in finding that Finley lacked a liberty interest, offers defendants little support. 720 F. App'x 222, 226 (6th Cir. 2017). In that case, the panel concluded that a violent prisoner placed in solitary confinement lacked a liberty interest based on an assessment only of the short duration of segregation and not of its nature. The court did not consider whether the confinement was indefinite (as was Finley's), an important factor. *See Smith v. Collins*, 964 F.3d 264, 280 (4th Cir. 2020); *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 562 (3d Cir. 2017). It likewise did not consider whether the conditions in the solitary cell rendered the hardship atypical and significant, perhaps because—other than a lighting issue—they were, unlike those in Finley's case, "not extreme" and "no more than temporary inconveniences." *Powell*, 720 F. App'x at 228. Finally, the *Powell* panel observed that the plaintiff's mental health provider had never indicated his needs could not be met in administrative segregation; here, by contrast, the SCC was clearly warned Finley's mental health would deteriorate. *Id.*

### B.     Finley did not receive the process due.

The Supreme Court has delineated the minimum process due when, as here, administrative segregation gives rise to a liberty interest. *See Hewitt v. Helms*, 459

43

U.S. 460, 476-77 (1983); *Wilkinson*, 545 U.S. at 224-30. A prisoner must receive notice that he may be placed in administrative segregation and a meaningful opportunity to present his views to the decisionmaker. *Hewitt*, 459 U.S. at 476.

When placed there, the prisoner must be offered a "short statement of reasons," to "guard[] against arbitrary decision making" and provide him a "basis for objection" in the future. *Wilkinson*, 545 U.S. at 226. And he must receive meaningful periodic reviews of the ongoing necessity of segregation, to ensure that it is not "used as a pretext for indefinite" isolation. *Hewitt*, 459 U.S. at 477 n.9; *Wilkinson*, 545 U.S. at 226; *Selby v. Caruso*, 734 F.3d 554, 560 (6th Cir. 2013) (considering whether reviews were "perfunctory . . . sham[s]).

**1.    Finley did not receive the process due in initial classifications to solitary confinement because he did not receive prior notice, he was not permitted to attend one of the hearings, and mental health recommendations were neither invited nor considered.**

In order to place Finley in idenfinite administrative segregation, prison officials first found him guilty of misconduct and then held a separate SCC hearing to decide whether to classify him to segregation. While he received notice of his misconduct hearings (where the potential punishment was revocation of privileges), he never received notice of the SCC hearings, which addressed a different question and were conducted by different officials. Without notice, he lacked the opportunity to prepare arguments and evidence against his placement in solitary confinement.

44

There was another even more egregious violation of Finley's due process rights: prison staff refused to let him attend the October SCC proceedings at all. This deprived Finley of any opportunity to challenge the second classification. Classification to solitary confinement without any opportunity to present opposition is unlawful. *See Hewitt*, 459 U.S. at 476.

The district court erroneously concluded, based again on this Court's unpublished decision in *Powell*, that notice of and opportunity to be heard at the misconduct hearing covered the SCC hearing. (R&R, R.100, PageID.1612-1616.) But *Powell* does not support this conclusion. It analyzed the pro se plaintiff's right to notice prior only to his "disciplinary" hearing because he did not raise such a claim with respect to his administrative segregation hearing. 720 F. App'x at 226. As the Supreme Court held in *Hewitt*, where the plaintiff's disciplinary charges and placement in solitary were decided at once by a single committee, a prisoner facing solitary confinement must be afforded notice and the related "opportunity to present his views *to the prison official charged with deciding whether to transfer him to administrative segregation.*" 459 U.S. at 476 (emphasis added).

Finley was additionally denied due process when the SCC committee failed to consider recommendations from MHPs in assigning him to administrative

45

segregation.[6] *See Braggs*, 257 F.Supp. at 1233 ("Not taking mental health into consideration when determining appropriate sanctions is dangerous because certain sanctions, such as placement in segregation, expose mentally ill prisoners to a substantial risk of worsening symptoms and significantly reduced access to monitoring and treatment."). Although an MHP was present at each hearing, this was a hollow formality: the provider, Hares, stated that MHPs were *not allowed* to recommend alternative placements to administrative segregation during SCC proceedings. (Hares Dep., R.88-8, PageID.803, 805.) Moreover, Hares admittedly did not know Finley's mental health diagnosis and was not his assigned clinician. (*Id.* at PageID.806.)

The record confirms that consideration of Finley's mental illness, required by policy, did not occur: both defendants left the space on the classification form "to be completed if the prisoner is receiving mental health services" entirely blank. (Corr. Recs., R.88-6, PageID.754; Schroeder Dep., R.88-10, PageID.831.) While defendants had access to Salmi's recommendation against solitary confinement, not

---

[6] Under *Mathews v. Eldridge*, Finley had a procedural due process right to consideration of his mental illness by the committee. 424 U.S. 319, 335 (1976). Against the backdrop of low private and high government interest in the prison context, *Wilkinson*, 545 U.S. at 225, failure to consider mental illness in solitary confinement classification decisions creates a high risk of erroneous deprivation, and the value of such consideration is substantial. The fact that prison policy already requires consideration of mental illness demonstrates that it would be valuable and not burdensome.

46

a single reference to Finley having a mental illness appears on either classification form. Pacholke described the hearings as a "pretense," with "no meaningful consideration of Mr. Finley's mental health." (Pacholke Decl., R.88-3, PageID.667.)

> **2.** **Finley did not receive the process due in perfunctory periodic reviews with foregone conclusions of continued solitary confinement.**

The periodic reviews of Finley's solitary confinement were "perfunctory and meaningless" and likewise violated Finley's right to due process. *Selby*, 734 F.3d at 557, 560 (reviews with "preordained outcome" violate due process); *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015) (rubber-stamping ongoing segregation by listing same reason repeatedly, not providing updated factual basis or considering objections); *Isby v. Brown*, 856 F.3d 508, 529 (7th Cir. 2017) (hearings pretextual if defendants failed to consider or document whether plaintiff posed ongoing security risk).

Finley was given no reason for continued segregation and no indication of what behavior was required to obtain release. The documentation from each periodic review consisted of a single sheet of paper, reciting the same boilerplate language, "inability to be managed with [general population] privileges." (Corr. Recs., R.88-6, PageID.770-775.) These forms merely mentioned that misconduct triggered his initial classification and did not discuss his subsequent conduct. (*Id.*) Despite his

47

repeated need for emergency surgery, the reclassification forms never mentioned his mental or physical health or their implications for his classification. (*Id.*)

### C. Defendants are not entitled to qualified immunity on Finley's procedural due process claim.

The district court erred in granting qualified immunity because Finley had clearly established rights to notice, opportunity to be heard, and meaningful periodic reviews of his solitary confinement.

The right to procedural protections prior to and during administrative segregation has been clearly established at least since the Supreme Court decided *Hewitt* in 1983, and was reaffirmed in *Wilkinson* in 2005. As discussed, these decisions together identify concrete requirements—notice that one may be placed in solitary and why, a chance to argue against that placement, a reason for the classification decision, and meaningful periodic review. *See Thorpe*, 37 F.4th at 943-46 (denying qualified immunity based on *Hewitt* and *Wilkinson*); *cf. Spann v. Lombardi*, 65 F.4th 987, 992 (8th Cir. 2023) (recognizing that right to *Hewitt/Wilkinson* procedural protections, as opposed to more robust protections, was clearly established).

**IV.** **Defendants are not entitled to summary judgment on Finley's ADA claims because they discriminated against him on the basis of his mental disability and failed to accommodate it when they confined him in administrative segregation.**

Title II of the Americans with Disabilities Act ("ADA") prohibits disability discrimination by public entities, such as defendant prison officials. [7] Two types of claims are cognizable under Title II: for intentional discrimination and reasonable accommodation. *Roell v. Hamilton Cnty.*, 870 F.3d 471, 488 (6th Cir. 2017). Finley has brought both, and both should proceed.

The first two elements of both types of claims are identical: Finley must show that he has a disability and is "otherwise qualified." *Knox Cnty., Tenn v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023). Finley has diagnosed bipolar disorder, which is a disability under the ADA. *See* 42 U.S.C.A. § 12102. Finley was eligible to participate in the various programs and activities available to people in general population, outpatient or inpatient mental health treatment programs, and less restrictive forms of solitary confinement. Defendants "do not dispute" that Finley "has a disability (his mental health conditions) and is otherwise qualified." (MSJ, R.84, PageID.356.) Instead, they contest only whether he was placed in solitary confinement because of his disability.

---

[7] Finley also brought a claim under the Rehabilitation Act, which is similar to the ADA, except that a plaintiff must prove he was discriminated against *solely* because of his disability. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc).

49

### A.    Defendants intentionally discriminated against Finley based on his mental disability when they classified him to solitary confinement because of behavior attributable to it.

The third and final element of an intentional discrimination claim is differential treatment on the basis of disability. *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 818 (6th Cir. 2020). This can be established through direct or indirect evidence. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004). Courts evaluate disability-discrimination claims relying on indirect or circumstantial evidence using the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas v. Green*, 411 U.S. 792, 801 (1973). If the plaintiff offers direct evidence, however, this framework does not apply. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). Direct evidence is an admission in some form that the defendant relied on the disability in making the adverse decision. *Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 855 (6th Cir. 2002).

### 1.    When officials take actions based on behavior resulting from disabilities, this is direct evidence of intentional discrimination.

This Court and others have consistently held that when defendants' stated reason for a challenged action was behavior of the plaintiff arising from his disability, this is direct evidence of discrimination. The Sixth Circuit has so held in the context of a medical disability, and many district courts have done so in cases of prisoners with mental disabilities placed in solitary confinement.

50

*Equal Emp. Opportunity Comm'n v. Dolgencorp* is on point. 899 F.3d 428 (6th Cir. 2018). In *Dolgencorp*, this Court held that firing an employee for drinking orange juice during a hypoglycemic episode prior to purchasing it from the store where she worked was direct evidence of discrimination, despite a facially neutral policy against consuming goods before purchase. *Id.* at 435.

District courts in the Sixth Circuit have found that adverse prison decisions made because of behavior resulting from mental illness is direct evidence of disability discrimination. In *Robinson v. Cuyahoga Cnty.*, the court found that the defendant's decision to stop providing medical treatment for the plaintiff's hand injury because of safety concerns relating to the plaintiff's aggressive behavior, which stemmed from his mental disability, was direct evidence of intentional discrimination. No. 1:22-cv-0961, 2022 WL 16793347 at *4 (N.D. Ohio, Nov. 8, 2022). *See also Thompson v. Washington*, No. 1:21-cv-683, 2022 WL 2128264 at *9 (W.D. Mich., June 14, 2022).

Other courts have held specifically that classifying a prisoner to administrative segregation for behavioral results of mental illness is direct evidence of discrimination. In *Latson v. Clarke*, for example, the court held that a plaintiff stated a disability-discrimination claim in alleging that defendants assigned him to administrative segregation because of uncontrollable aggressive outbursts traceable

51

to autism. 249 F. Supp. at 856; *see also Robertson v. Contra Costa Cnty.*, No. 15-cv-02549, 2016 WL 4259135, *6 (N.D. Cal. Aug. 12, 2016).

> **2.    Defendants' admitted reasons for placing Finley in solitary confinement are direct evidence of intentional discrimination.**

Defendants documented their reasons for classifying Finley on the SCC forms. (Corr. Recs., R.88-6, PageID.754; Schroeder Dep., R.88-10, PageID.831.) These forms indicated that the classification hearing was triggered by (in the first case) a misconduct charge for possessing a razor blade and (in the second case) a misconduct charge for disobeying a direct order, and that (in both cases) the prison was unable to manage Finley in general population. (Corr. Recs., R.88-6, PageID.754.)

Under the binding precedent of *Dolgencorp*, the decision to place Finley in administrative segregation for possessing a razor blade or for failing to come to his cell door is direct evidence of discrimination on the basis of his mental disability. Finley was sanctioned for possessing a razor at a time when he physically could not return it to prison staff, having swallowed it. This misconduct is plainly intertwined with Finley's mental illness—swallowing a razor is behavior that simply does not occur absent serious mental illness. Similarly, his refusal to come to the cell door while suicidal has a "clear nexus to his mental health." (Kupers Decl., R.88-3, PageID.665.) Though rules prohibiting contraband and requiring obedience to orders

52

are facially neutral and though violating them may in other instances be a permissible basis for reclassification, these stated reasons for placing Finley in solitary confinement are admissions that defendants took adverse action based on his mental illness.[8]

> **B.     Even if the *McDonnell Douglas* burden-shifting framework were to apply, defendants' currently asserted reason for keeping Finley in administrative segregation—keeping him away from razor blades—is pretextual.**

Relying on the generic statement on the classification forms—the first of three preprinted checkbox options—that Finley's misconduct demonstrated he could not be managed in general population, defendants contend that they placed him in administrative segregation not based on his disability-impelled misconduct but because such a placement would restrict his access to the razors he was using to harm himself. (MSJ, R.84, PageID.343-344.) At best, their testimony to this effect creates a triable issue as to whether there is direct—as opposed to indirect—evidence of disability discrimination.

---

[8] Defendants now purport to have had additional reasons for classifying Finley to administrative segregation. *See supra* n.4. Even if they are credited, discrimination need not be based solely on a disability to be actionable. *Lewis*, 681 F.3d at 317.

When a plaintiff uses indirect evidence to establish discrimination, his prima facie case[9] shifts the burden to the defendant to articulate a legitimate, nondiscriminatory reason for the action; to prevail, the plaintiff must demonstrate that defendants' explanation is a mere pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802.

Even if defendants' stated reasons for placing Finley in solitary confinement are not treated as direct evidence, their contention that they put him there to protect him is plainly pretextual. To establish pretext, a plaintiff must show that defendants' proffered reason "had no basis in fact [or] was insufficient to warrant" their decision. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 422 (6th Cir. 2021). Defendants' purported rationale had no basis in fact: they failed spectacularly to keep Finley away from razor blades while he was in solitary confinement, observing him cutting himself for hours without intervening, and there was good reason to believe that his misuse of razor blades to harm himself would be exacerbated by administrative

---

[9] Finley plainly satisfies the requirement of a prima facie case: he was classified to administrative segregation in the midst of a mental health crisis, based on behavior resulting from his serious mental illness, over the objections of his mental health provider that such placement would further harm his mental health and that intensive mental health treatment was the appropriate alternative.

segregation.[10] Their purported rationale was also insufficient to warrant placement in administrative segregation: they failed to take the obvious alternative step of enforcing Salmi's order that he not be allowed access to razor blades while in general population.

### C.    Defendants failed to reasonably accommodate Finley's mental disability when they failed to move him into mental health treatment or to mitigate the severity of his solitary confinement.

Failure to reasonably accommodate a prisoner is a form of disability discrimination under the ADA. *See Knox Cnty.*, 62 F. 4th at 1000. To prevail on a failure-to-accommodate claim, the plaintiff must show that defendants could reasonably have accommodated his disability but refused to do so, and that this impeded his ability to participate in, or benefit from, their programs. *Id.* Because failure to accommodate is incorporated into the ADA's definition of disability discrimination, failure-to-accommodate claims necessarily involve direct evidence of discrimination. *Fisher*, 951 F.3d at 416.

---

[10] Dr. Kupers explained that because Finley injured himself with razors only while in "official or unofficial solitary confinement" such as an observation cell, classifying him to administrative segregation "as a consequence of self-mutilation [was] most definitely counter-productive." (Kupers Decl., R.88-2, PageID.611.) He described defendants' failure to prevent Finley from accessing razors while under observation as "entirely incomprehensible, and violative of every standard in corrections." (*Id.*, PageID.626.)

If defendants believed they could not manage Finley in general population, they could and should have accommodated his disability by placing him in a mental health treatment program rather than solitary confinement, as Salmi and other providers recommended. Analogy to a physical disability illustrates defendants' failure to accommodate. In *Douglas v. Muzzin*, the plaintiff requested orthopedic shoes to accommodate a longstanding disability; he was denied access to programming because he could not tolerate the pain of walking without them. No. 21-2801, 2022 WL 3088240, at *6-8 (6th Cir. Aug. 3, 2022) (reversing grant of summary judgment). Similarly, Finley requested placement in a mental health treatment program soon after swallowing the first razor blade. (Finley Dep., R.88-4, PageID.689.) Like the plaintiff in *Douglas*, Finley could have participated in normal prison programming and received appropriate healthcare had he been provided the accommodation he and his MHP sought. Instead, Finley was forced to live in conditions that severely exacerbated his mental illness. *See also Rinehart v. Weitzell*, 964 F.3d 684, 688-89 (8th Cir. 2020) (prisoner with diverticulitis denied medical exception permitting him to retain privleges while housed in cell with toilet stated failure-to-accommodate claim); *Ingram v. Clements*, 705 F. App'x 721, 725-26 (10th Cir. 2017) (prisoner unable to stand in long pill line stated failure-to-accommodate claim based on "temporal/spatial barrier" to obtaining prescribed care).

56

Alternatively, defendants could and should have accommodated Finley's mental illness by modifying the conditions of solitary confinement to impact his mental health less detrimentally, permitting him to attend recreation and therapy and moving him from a "Base level" cell to one with a window where he could hear others speak. Failure to modify conditions of solitary confinement can constitute a failure to provide reasonable accommodations. *See Harvard v. Inch*, 411 F. Supp. 3d 1220, 1241-42 (N.D. Fla. 2019) (allegations of inadequate out-of-cell time, social interaction, environmental stimulation, and mental health treatment in solitary confinement stated claim for failure to reasonably accommodate prisoners with serious mental illness).[11]

## CONCLUSION

For the forgoing reasons, this Court should reverse the district court's grant of summary judgment and remand for trial on all claims.

---

[11] Other courts have recognized that placement in and refusal to modify conditions of solitary confinement can consistute failure to accommodate a mental disability. *See, e.g.*, *Thorpe v. Virginia Dep't of Corr.*, No. 2:20-cv-00007, 2020 WL 10354128, at *35-36, (W.D. Va. Sept. 4, 2020), *report and recommendation adopted in relevant part*, 2021 WL 2435868, at *9-10 (W.D. Va. June 15, 2021), *aff'd sub nom. Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022); *Partridge v. Smith*, No. 17-cv-02941, 2019 WL 8370781, at *8-10 (D. Colo. Dec. 3, 2019), *report and recommendation adopted*, 2020 WL 897653 (D. Colo. Feb. 25, 2020); *Wade v. Montgomery Cnty.*, No. 4:17-cv-1040, 2017 WL 7058237, at *4-5 (S.D. Tex. Dec. 6, 2017), *report and recommendation adopted*, 2018 WL 580642 (S.D. Tex. Jan. 25, 2018); *Ramos v. Quiros*, No. 3:11-cv-1616, 2012 WL 4501673, at *1-4 (D. Conn. Sept. 27, 2012).

Dated: May 26, 2023

Respectfully submitted,

By: /s/ Aaron Littman

**UCLA SCHOOL OF LAW
PRISONERS' RIGHTS CLINIC**
AARON LITTMAN
385 CHARLES E. YOUNG DRIVE E
LOS ANGELES, CALIFORNIA 90095
(310) 825-9562

**RODERICK & SOLANGE
MACARTHUR JUSTICE CENTER**
DANIEL M. GREENFIELD*
501 H STREET NE, STE. 275
WASHINGTON, D.C. 20002
(202) 869-1664

*Counsel for Plaintiff-Appellant
Timothy Finley*

\* Admitted to the bar of this Court and that of Illinois. Admission pending to the bar of DC.

58

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font.

/s/ Aaron Littman
Aaron Littman

**CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Aaron Littman
Aaron Littman

**ADDENDUM**

**Appellant's Designation of Relevant District Court Documents**

U.S. District Court for the Western District of Michigan, Case No. 2:18-cv-00100

| Record Entry | Description of Document | Page ID # |
|---|---|---|
| 10 | First Amended Complaint ("Compl.") | 40-74 |
| 84 | Brief in Support of Defendants' Motion for Summary Judgment ("MSJ") | 336-358 |
| 88 | Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("MSJ Opp.") | 542-585 |
| 88-2 | Exhibit 1: Terry Kupers' Declaration with Attachments ("Kupers Decl.") | 588-642 |
| 88-3 | Exhibit 2: Dan Pacholke's Declaration with Attachments ("Pacholke Decl.") | 643-679 |
| 88-4 | Exhibit 3: Timothy Finley's Deposition Excerpts ("Finley Dep.") | 680-711 |
| 88-5 | Exhibit 4: MDOC Medical Records of Timothy Finley ("Med. Recs.") | 712-745 |
| 88-6 | Exhibit 5: MDOC Correctional Records of Timothy Finley ("Corr. Recs.") | 746-775 |
| 88-7 | Exhibit 6: Mandi Salmi Deposition Excerpts with Exhibits ("Salmi Dep.") | 776-796 |
| 88-8 | Exhibit 7: Mark Hares Deposition Excerpts with Exhibits ("Hares Dep.") | 797-812 |

61

| Record Entry | Description of Document | Page ID # |
|---|---|---|
| 88-9 | Exhibit 8: Erica Huss Deposition Excerpts with Exhibits ("Huss Dep.") | 813-821 |
| 88-10 | Exhibit 9: Sarah Schroeder Deposition Excerpts with Exhibit ("Schroeder Dep.") | 822-831 |
| 88-11 | Exhibit 10: MDOC SHU Records of Timothy Finley ("SHU Recs.") | 832-844 |
| 88-12 | Exhibit 11: MDOC Policy Directive 03.03.105 Prisoner Discipline ("Discipline Policy") | 845-848 |
| 88-13 | Exhibit 12: MDOC Policy Directive 04.06.182 Mentally Disabled Prisoners in Segregation ("Disabled Policy") | 849-851 |
| 88-14 | Exhibit 13: MDOC Policy Directive 04.05.120 Segregation Standards ("Segregation Policy") | 852-854 |
| 88-15 | Exhibit 14: MDOC Prisoner Guidebook Excerpts ("Guidebook") | 855-862 |
| 88-16 | Exhibit 15: Demonstrative Exhibit Summarizing Finley SHU Records in Weekly Calendar ("Calendar") | 863-875 |
| 88-18 | Exhibit 17: Email Communications ("Emails") | 882-887 |
| 100 | Report and Recommendation ("R&R") | 1587-1632 |
| 104 | Plaintiff's Objections to Report and Recommendation ("R&R Objs.") | 1639-1679 |
| 105 | Defendant's Response to Plaintiff's Objections to Report and Recommendation ("R&R Objs. Resp.") | 1680-1691 |

| Record Entry | Description of Document | Page ID # |
|:---:|:---:|:---:|
| 110 | Plaintiff's Supplemental Brief Addressing Recent Supreme Court Precedent ("Suppl. Br.") | 1700-1706 |
| 111 | Defendants' Response to Plaintiff's Supplemental Brief ("Suppl. Br. Resp.") | 1707-1714 |
| 113 | Order Adopting Report and Recommendation ("Order") | 1717-1722 |
| 114 | Judgment in Favor of Defendants Against Plaintiff ("Judgm't") | 1723 |
| 115 | Notice of Appeal ("NOA") | 1725-1726 |

63