**No. 23-1083**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

**TIMOTHY FINLEY**,

*Plaintiff-Appellant,*

v.

**ERICA HUSS and SARAH SCHROEDER**,

*Defendants-Appellees.*

---

On Appeal from the United States District Court for the
Western District of Michigan, Case No. 2:18-cv-00100
Before the Hon. Gordon J. Quist

---

**PLAINTIFF-APPELLANT'S REPLY BRIEF**

---

Aaron Littman
UCLA SCHOOL OF LAW
 PRISONERS' RIGHTS CLINIC
385 Charles E. Young Drive E
Los Angeles, CA 90095
(310) 925-9562

Christine A. Monta
Daniel M. Greenfield
RODERICK & SOLANGE
 MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington DC 20002
(202) 869-3308
christine.monta@macarthurjustice.org

*Counsel for Plaintiff-Appellant Timothy Finley*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iii

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................. 2

I.   Defendants' Sanitized Version of the Facts Defies the
Summary Judgment Standard .................................................... 2

II.  Defendants Are Not Entitled to Summary Judgment on
Finley's Eighth Amendment Claim ............................................ 9

    A.   Finley raised a genuine dispute as to whether
Defendants violated the Eighth Amendment ................................. 9

    B.   The right Defendants violated was clearly established ....... 11

    C.   Accepting Finley's facts as true, the constitutional
violation was obvious ....................................................... 19

III. Defendants Are Not Entitled to Summary Judgment on
Finley's Procedural Due Process Claim .................................... 21

    A.   Determining whether a confinement condition imposed
an atypical-and-significant hardship must consider the
prisoner's individual vulnerabilities ..................................... 21

    B.   Prolonged, indefinite confinement in an MBP base cell
was an atypical-and-significant hardship for Finley .................... 24

    C.   Finley did not receive the process he was due ................. 25

    D.   Finley's due process rights were clearly established ......... 26

IV.  Defendants Are Not Entitled to Summary Judgment on
Finley's Disability-Discrimination Claims ............................... 27

    A.   Finley raised a genuine issue regarding whether his
disability caused the behaviors for which Defendants
reclassified him to solitary ............................................... 28

i

B.    Finley raised a genuine issue on whether Defendants failed to reasonably accommodate his disability ........................... 31

C.    *McDonnell Douglas* does not apply to Finley's claims; regardless, Finley raised a genuine issue as to pretext ............... 32

CONCLUSION ................................................................................. 35

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Anderson v. City of Blue Ash,*
798 F.3d 338 (6th Cir. 2015)............................................................29

*Austin v. Wilkinson,*
372 F.3d 346 (6th Cir. 2004).....................................................21, 22

*Barker v. Goodrich,*
649 F.3d 428 (6th Cir. 2011)...........................................2, 3, 17, 26

*Bays v. Montmorency County,*
874 F.3d 264 (6th Cir. 2017)............................................................12

*Beers-Capitol v. Whetzel,*
256 F.3d 120 (3d Cir. 2001) ............................................................17

*Blanchet v. Charter Commc'ns, LLC,*
27 F.4th 1221 (6th Cir. 2022) ..........................................20, 21, 32, 34

*Blaylock v. Adams,*
No. 2:22-cv-10831, 2022 WL 2079865 (E.D. Mich. June 9,
2022) ...............................................................................................24

*CenTra, Inc. v. Estrin,*
538 F.3d 402 (6th Cir. 2008).......................................................3, 26

*Clark v. Coupe,*
55 F.4th 167 (3d Cir. 2022)..............................................................16

*Clark-Murphy v. Foreback,*
439 F.3d 280 (6th Cir. 2006)............................................................12

*Comstock v. McCrary,*
273 F.3d 693 (6th Cir. 2001)................................................10, 12, 18

*Creech v. Ohio Dep't of Rehab. & Corr.,*
No. 21-3722, 2022 WL 4138415 (6th Cir. Sept. 13, 2022).................34

iii

*Delgado-Brunet v. Clark*,
   93 F.3d 339 (7th Cir. 1996) ............................................................... 17

*EEOC v. Dolgencorp, LLC*,
   899 F.3d 428 (6th Cir. 2018) .................................................. 28, 29, 33

*Estelle v. Gamble*,
   429 U.S. 97 (1976) ...................................................................... 11, 12

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ......................................................................... 12

*Finley v. Huss*,
   723 F. App'x 294 (6th Cir. 2018) ....................................................... 9

*Flint v. Kentucky Dep't of Corrs.*,
   270 F.3d 340 (6th Cir. 2001) ............................................................ 13

*Haywood v. Winn*,
   No. 2:20-cv-12976, 2021 WL 1192975 (E.D. Mich. Mar. 30,
   2021) ............................................................................................. 24

*Hewitt v. Helms*,
   459 U.S. 460 (1983) ......................................................................... 25

*Hope v. Pelzer*,
   536 U.S. 730 (2002) ......................................................................... 19

*Humphrey v. Mem'l Hosps. Ass'n*,
   239 F.3d 1128 (9th Cir. 2001) ..................................................... 28, 31

*J.H. v. Williamson Cnty.*,
   951 F.3d 709 (6th Cir. 2020) ...................................................... 23, 24

*Kleiber v. Honda of Am. Mfg., Inc.*,
   485 F.3d 862 (6th Cir. 2007) ............................................................ 33

*Knox County v. M.Q.*,
   62 F.4th 978 (6th Cir. 2023) ............................................................ 27

*Linden v. Washtenaw County*,
   167 F. App'x 410 (6th Cir. 2006) ................................................ 14, 15

iv

*Malley v. Briggs*,
   475 U.S. 335 (1986) ...................................................................... 17

*McCloud v. Testa*,
   97 F.3d 1536 (6th Cir. 1996) ......................................................... 14

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ......................................................... 32, 33, 34

*McKee v. Turner*,
   124 F.3d 198 (6th Cir. 1997) .......................................................... 17

*McMillan v. City of New York*,
   711 F.3d 120 (2d Cir. 2013) ..................................................... 28, 33

*McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*,
   119 F.3d 453 (6th Cir. 1997) .......................................................... 29

*Miller v. Solem*,
   728 F.2d 1020 (8th Cir. 1984) ........................................................ 17

*Morgan v. Trierweiler*,
   67 F.4th 362 (6th Cir. 2023) .......................................................... 34

*Murray v. Department of Corrs.*,
   29 F.4th 779 (6th Cir. 2022) .......................................................... 18

*Porter v. Clarke*,
   923 F.3d 348 (4th Cir. 2019) .......................................................... 11

*Rafferty v. Trumbull County*,
   915 F.3d 1087 (6th Cir. 2019) ........................................................ 18

*Robinson v. Cuyahoga Cnty.*,
   No. 1:22-cv-0961, 2022 WL 16793347 (N.D. Ohio Nov. 8,
   2022) .......................................................................................... 28

*Sandin v. Connor*,
   515 U.S. 472 (1995) ...................................................................... 23

*Serrano v. Francis*,
   345 F.3d 1071 (9th Cir. 2003) ........................................................ 23

*Taylor v. Riojas,*
    141 S. Ct. 52 (2020)................................................................. 19, 21

*Thorpe v. Clarke,*
    37 F.4th 926 (4th Cir. 2022) ....................................................... 16, 17

*Ward v. Massachusetts Health Research Inst., Inc.,*
    209 F.3d 29 (1st Cir. 2000) .........................................................28, 30

**Statutes**

Americans with Disabilities Act of 1990, Titles I and II (42
    U.S.C. § 12101-12132)..........................................................................29

## INTRODUCTION

Defendants do not dispute that the facts Timothy Finley presented raised a genuine issue regarding whether they violated the Eighth Amendment, nor do they dispute that a reasonable corrections officer had notice that subjecting Finley to indefinite solitary confinement, knowing the risk it posed to his health and safety, would be cruel and unusual. Instead, Defendants ask this Court to grant them immunity based on *their own* version of the facts—one that downplays their knowledge of the risk solitary posed to Finley's already precarious and declining mental health and entirely ignores the serious physical and psychiatric harm that befell him as a result of their decisions. Defendants' cherrypicked evidence, at most, raises a genuine issue on factual disputes that must be resolved by a jury. Viewing the facts under the proper standard, this Court cannot grant Defendants qualified immunity, as no reasonable corrections officer could believe that subjecting a prisoner to a condition she knows poses a substantial risk of psychiatric and life-threatening physical harm—the circumstances Finley's evidence presents—is consistent with the Eighth Amendment.

1

Defendants' responses to Finley's procedural-due-process and disability-discrimination claims fare no better. Defendants' procedural-due-process defense hinges on their erroneous assertion that this Court's case law forbids considering a prisoner's unique vulnerabilities in assessing whether a confinement condition imposed an atypical-and-significant hardship. This Court, however, has never erected such an artificial restriction, which would run contrary to logic, decisions of four other circuits, and this Court's treatment of the analogous question in substantive-due-process cases. Defendants' response to Finley's disability-discrimination claims, like their response to his Eighth Amendment claim, turns on factual disputes that cannot be decided at summary judgment. Unable to defend on the merits, Defendants assert frivolous "waiver" arguments that this Court should reject wholesale.

## ARGUMENT

### I. Defendants' Sanitized Version of the Facts Defies the Summary Judgment Standard

It is axiomatic that, on summary judgment, the evidence must be construed, and all reasonable inferences drawn, in favor of the non-movant—here, Finley. *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011). It is also axiomatic that, "for the purposes of qualified immunity,

2

this Court must take the plaintiff's evidence as true." *Id.* at 436. Credibility judgments and weighing of evidence are prohibited. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).

Eschewing those bedrock principles, Defendants "improperly rely on their version of the facts, rather than" Finley's, at every stage. *Barker*, 649 F.3d at 435. The evidence, viewed in the light most favorable to Finley, tells a markedly different story than the one Defendants present. We briefly recount that evidence to reorient the Court to the proper facts upon which it must decide this appeal:

In the fall of 2016, Erica Huss and Sarah Schroeder, Deputy Wardens at Marquette Branch Prison (MBP), knew Finley suffered from a serious mental illness.[1] They knew he was consistently assessed by prison mental health professionals to be a suicide risk and consequently placed on suicide observation.[2] They knew that, in a span of weeks, he had engaged in multiple instances of self-harm, including swallowing

---

[1] Corr. Recs., R.88-6, PageID.749-753.

[2] Med. Recs., R.88-5, PageID.720-738; Hares Dep., R.88-8, PageID.799-800.

3

razorblades, while in solitary confinement.[3]  And they knew—because they were specifically warned, because they were trained to understand, and because it was obvious—that prolonged placement in solitary would exacerbate his mental illness and increase the risk he would undertake further self-harm.[4]  Indeed, Huss told Finley in mid-September she was not sending him to solitary then precisely *because* she knew it was detrimental to his mental health.[5]

Yet, despite that knowledge, Huss decided, on September 27, 2016, to consign Finley to indefinite solitary confinement for swallowing a razorblade—conduct that was caused by, and inextricably bound up in, his mental illness.[6]  She did so without consulting mental health professionals, without considering safer alternatives, and without

---

[3] Emails, R.88-18, PageID.883-887; Huss Dep., R.88-9, PageID.817; Schroeder Dep., R.88-10, PageID.824-825.

[4] Corr. Recs., R.88-6, PageID.750, 763-768; Disabled Policy, R.88-13, PageID.850.

[5] Finley Dep., R.88-4, PageID.697-698.

[6] Corr. Recs., R.88-6, PageID.749-754; *infra* pp. 29-30.

offering a meaningful explanation.[7]   Within days of Huss's decision, Finley engaged again in life-threatening self-harm while in solitary— swallowing another razorblade, cutting himself, opening lacerations, and ingesting pills—requiring him to be rushed twice to the emergency room and subsequently airlifted to another hospital to have two swallowed razorblades surgically removed.[8]

Despite these events, a mere six days after Finley returned from the hospital, Schroeder decided that he should remain in solitary indefinitely.[9]   As with Huss, Schroeder did so without consulting mental health professionals, without considering safer alternatives, and without offering a meaningful explanation.[10]   Schroeder then left Finley to languish in solitary for nearly three months, despite having received and

---

[7]   Corr. Recs., R.88-6, PageID.754; Huss Dep., R.88-9, PageID.816-818; Hares Dep., R.88-8, PageID.803, 805-806; Pacholke Decl., R.88-3, PageID.664-667.

[8]   Med. Recs., R.88-5, PageID.732-734; Emails, R.88-18, PageID.886; Corr. Recs., R.88-6, PageID.755-757; Finley Dep., R.88-4, PageID.699.

[9]   Schroeder Dep., R.88-10, PageID.831.

[10]   *Id.* at PageID.825-826, 831; Pacholke Decl., R.88-3, PageID.665-667.

approved a request from Finley's qualified mental health professional (QMHP) to move him to the prison's Interim Care Program (ICP).[11] That delay, in violation of prison policy, caused Finley grave harm; his psychiatric expert testified that Finley experienced "painfully exacerbated psychiatric symptoms" from his continued isolation, the "damaging effects" of which "will last for a very long time."[12]

Defendants' brief ignores much of this evidence, including—most notably—the life-threatening self-harm Finley committed immediately after Huss reclassified him to solitary, which Defendants omit entirely. *See, e.g.*, Appellees Br. 11. Defendants also downplay, if not wholly ignore, the extensive evidence demonstrating they knew placing Finley in solitary posed a risk to his health and safety, including (1) multiple express warnings from his assigned QMHP, Mandi Salmi, that "prolonged segregation placement is likely to deteriorate [his] mental health status"; (2) the fact that Finley had repeatedly committed acts of

---

[11] Corr. Recs., R.88-6, PageID.748; Salmi Dep., R.88-7, PageID.794-795.

[12] Kupers Decl., R.88-2, PageID.628-629; *see* Finley Dep., R.88-4, PageID.706; Disabled Policy, R.88-13, PageID.851.

self-harm while in solitary conditions before; (3) the fact that MBP policy generally prohibits placing mentally ill prisoners in solitary; and (4) the fact that Huss told Finley she was not sending him to solitary earlier precisely because she knew it would harm his mental health.[13]  Although Defendants urge (at 47) that a QMHP attended Finley's SCC hearings and "did not raise any objections or concerns" about reclassifying him, a reasonable jury could find that the QMHP's silence did not wipe out Defendants' knowledge of the potential harm, particularly given the QMHP's testimony that QMHPs seldom voice opinions about custody placements at SCC hearings and that he was unaware of Salmi's prior warnings because he was "not [Finley's] assigned clinician"—evidence Defendants completely ignore.[14]

Moreover, it is undisputed that, on October 27, QMHP Salmi asked Schroeder to transfer Finley to ICP because his "treatment needs cannot be met while in" solitary—a transfer Schroeder approved.[15]  Schroeder

---

[13]  *See* pp. 3-4 & nn. 3-5, *supra.*

[14]  Hares Dep., R.88-8, PageID.803-806.

[15]   Salmi Dep., R.88-7, PageID.794-795.

certainly knew then that Finley should not remain in solitary; yet, she left him there an additional two-and-a-half months, in violation of MBP policy requiring transfer "no later than three business days after receipt of the recommendation."[16] Defendants' assertion (at 15) that the three-day policy did not apply because ICP is an outpatient program is simply false. The three-day policy applies *only* to recommendations for outpatient services; if a QMHP recommends *inpatient* services, the policy requires transfer "as soon as possible," without need to seek the Deputy Warden's approval.[17] Indeed, Salmi's October 27 email explicitly informed Schroeder that the three-day policy applied.[18] On summary judgment, this Court must accept that Defendants left Finley in solitary for over ten weeks in violation of policy and his QMHP's recommendation.

Defendants also seek to abridge Finley's term in solitary, asserting repeatedly that he did not actually enter solitary until October 25. That too is false. Finley was confined in solitary conditions—whether labeled

---

[16] Disabled Policy, R.88-13, PageID.851.

[17] *Ibid.*

[18] Salmi Dep., R.88-7, PageID.795.

8

"suicide observation" or "administrative segregation"—almost continually from the moment he alerted staff on August 30 he was contemplating self-harm.[19]   Indeed, Finley was in "administrative segregation" for five days awaiting his first SCC hearing, returned to it following Huss's reclassification decision, and was there when he engaged in the self-harm necessitating emergency surgery.   The only times Finley was *not* in solitary conditions during the 106 days between Huss's decision and his transfer to ICP were his two brief trips to the emergency room and the six days he spent in the hospital.

In sum, this Court must ignore Defendants' version of the facts, which selectively excises information unfavorable to them on disputed issues—the opposite of what the summary judgment standard requires.

## II. Defendants Are Not Entitled to Summary Judgment on Finley's Eighth Amendment Claim

### A. Finley raised a genuine dispute as to whether Defendants violated the Eighth Amendment

This Court already concluded that Finley's allegations, "if true, would state a claim under the Eighth Amendment." *Finley v. Huss*, 723

---

[19]  *See* Opening Br. 6-13 & n.1; Corr. Recs., R.88-6, PageID.748.

F. App'x 294, 298 (6th Cir. 2018). The evidence Finley developed in discovery only confirms those allegations.

The "voluminous evidence of self-harm and suicidal behavior" underlying the district court's objective-prong finding (R&R, R.100, PageID.1600) unquestionably establishes a risk to the "basic human necessity" of "reasonable safety." Appellees Br. 46; *see Comstock v. McCrary*, 273 F.3d 693, 703-704 (6th Cir. 2001) (serious psychological needs and suicidal tendencies satisfies objective prong). Defendants argue, nevertheless (at 46), that solitary did not "negatively impact [Finley's] mental health, but in fact improved his condition."

Defendants' remarkable contention is belied by the life-threatening self-harm Finley engaged in immediately after Huss consigned him to solitary, and by the evidence that he suffered serious psychiatric injury throughout his entire time in solitary, even after medication permitted him to avoid "actively engaging in self harm."[20] Defendants ignore that evidence, but this Court cannot. In any event, disputes regarding the extent to which Defendants' decisions harmed Finley go to damages and

---

[20]   Finley Dep., R.88-4, PageID.706; *see* Kupers Decl., R.88-2, PageID.606.

10

causation—quintessential jury issues—not the objective seriousness of the risk that existed when Defendants made their decisions. *See Porter v. Clarke*, 923 F.3d 348, 360-361 (4th Cir. 2019).

Defendants' claim (at 47) that there was no triable issue as to their awareness of the risk likewise fails. As outlined above, Finley presented considerable evidence from which a reasonable juror could conclude that Defendants knew the risk to Finley's mental health and physical safety when they reclassified him to, and then kept him in, solitary confinement. Defendants ask this Court to disregard that evidence and infer the opposite, but that is for the jury to decide.

## B.    The right Defendants violated was clearly established

Defendants make two fundamental errors in defending qualified immunity: (1) defining the right in a way that is both too narrow and insufficiently specific, and (2) insisting on one-to-one fact-matching, an approach the Supreme Court and this Court have rejected.

It has been nearly half a century since the Supreme Court recognized that deliberate indifference to a prisoner's serious medical needs constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment, *Estelle v. Gamble*, 429 U.S. 97, 104

11

(1976) (citation omitted), and nearly 30 years since it recognized that an official violates that Amendment if she "knows of and disregards an excessive risk to inmate health or safety," *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This Court has applied those foundational holdings to numerous cases, including those that bear striking similarity to Finley's.

In *Comstock*, for example—decided in 2001—this Court held that a prison official who knew a prisoner was "at risk of serious self-inflicted harm" but ignored that risk and released the prisoner to administrative segregation, where he killed himself, violated the prisoner's clearly established right not to have known medical needs ignored. 273 F.3d at 704; *see id.* at 703-711. Although no prior case had closely analogous facts, this Court held the unlawfulness "apparent" in light of the numerous circuit cases applying *Estelle* to hold that ignoring a prisoner's known "psychological needs" and "suicidal tendencies" violates the Eighth Amendment. *Id.* at 711; *see also Bays v. Montmorency County*, 874 F.3d 264, 270 (6th Cir. 2017) (suicidal detainee's "right to have a serious psychological illness treated seriously" clearly established by 2013); *Clark-Murphy v. Foreback*, 439 F.3d 280, 282-284, 292 (6th Cir. 2006) (officials who left mentally ill prisoner in "isolation" and ignored

12

his signs of distress because they thought he was "faking" and trying "to manipulate his way to a transfer" violated clearly established "right to psychological treatment").

Finley's evidence shows not just that Defendants *ignored* the known risk that placing him into indefinite solitary confinement would lead to psychiatric damage and life-threatening self-harm—they consciously chose to *subject him* to that known risk. No reasonable corrections officer could believe that subjecting a severely mentally-ill, suicidal inmate to a condition she knows is likely to exacerbate his mental decline and lead to him to engage in potentially lethal self-harm is consistent with the Eighth Amendment. *See Flint v. Kentucky Dep't of Corrs.*, 270 F.3d 340, 353-355 (6th Cir. 2001) (no qualified immunity for official who was "deliberately indifferent to a known risk" to prisoner's health and safety, "which [the official], himself, created").

Defendants ignore the most critical aspect of Finley's evidence—the fact that they *knew* relegating him to indefinite solitary confinement posed a substantial risk of harm, but did it anyway—and ask this Court to conduct the clearly-established analysis without regard to that knowledge, defining the question (at 31) as whether it was clearly

13

established that "placing a mentally ill prisoner in administrative segregation violate[s] the Eighth Amendment." But Finley is not asserting a general right of mentally ill prisoners not to be placed in solitary. He is asserting a right not to have prison officials ignore—much less consciously subject him to—a condition they know threatens to deteriorate his mental health and cause him to engage in life-threatening self-harm. That right, as noted above, was well-established as of 2016.

This Court rejected a framing nearly identical to Defendants' in *Linden v. Washtenaw County*, 167 F. App'x 410 (6th Cir. 2006).[21] There, a pretrial detainee committed suicide shortly after being moved to isolation. His estate sued the officer who decided to move him, relying on evidence the officer knew the detainee had previously attempted suicide and threatened to again; understood that prison policy generally required suicidal detainees to remain in the medical unit; and was alerted by a social worker that the detainee "doesn't do very well when he's isolated," but decided to move him to isolation anyway. *Id.* at 425.

---

[21] Although unpublished decisions cannot provide a source of clearly-established law, this Court can consider them for their persuasive value in demonstrating how it analyzes qualified immunity. *See McCloud v. Testa*, 97 F.3d 1536, 1555 n. 28 (6th Cir. 1996).

14

The district court granted qualified immunity, ruling it was not clearly established that placing an "unstable" detainee with "a history of previous suicide attempt[s]" in "isolation" was unlawful. *Id.* at 423.

This Court reversed, concluding that the district court improperly narrowed the scope of the clearly-established inquiry. The Court explained that "[b]y erroneously honing in on the *specific act* of …moving [the detainee] to an isolation cell," the district court "elided the function of this prong of the test: determining whether a *right* is clearly established." *Id.* at 425. Because "ample case law teaches that deliberate indifference toward a detainee's suicidal tendencies" is a constitutional violation, this Court held the right was clearly established—the "very action" the officer undertook to deprive the detainee of that right was "not pertinent to this inquiry." *Ibid.* And because the officer "had knowledge of" the detainee's suicidal tendencies and "understood that placing him in isolation aggravated them" but "ignored" that risk and did it anyway, "fully aware that this act would endanger [his] life," this Court held that a reasonable officer "would not have transferred [the detainee] into a solitary cell." *Id.* at 425-426.

15

The Third Circuit adopted a similar analysis in *Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022). There, a mentally ill prisoner alleged that officials violated the Eighth Amendment by keeping him in solitary for months, based on manifestations of his mental illness treated as rule infractions, despite knowledge it would deteriorate his "already severely compromised mental health." *Id.* at 181. The district court granted qualified immunity, concluding it was not clearly established that "months-long placement of a seriously mentally ill inmate in solitary confinement" violated the Constitution. *Id.* at 178. The Third Circuit reversed, holding that the district court's definition of the right failed to account for the "*particular* conduct at issue"—namely, that the officers *knew* that prolonged isolation "carried a substantial risk of exacerbating [the prisoner's] mental illnesses" but imposed it anyway. *Id.* at 182-183. Defined as such, the Court concluded, the right was clearly established, as "no reasonable corrections officer could conclude" such conduct "was constitutionally permissible." *Id.* at 183-185; *see also Thorpe v. Clarke*, 37 F.4th 926, 933-937 (4th Cir. 2022) (rejecting as a "dissociative approach" defendants' effort to "shift frames and focus not on their

16

mental state" but on whether it was clearly established that "solitary confinement in itself" violated the Eighth Amendment).

Indeed, this Court has recognized that it "would not make any sense" to permit an official who "deliberately ignored" a known risk to "claim that it would not have been apparent to a reasonable person that such actions violated the law." *McKee v. Turner*, 124 F.3d 198, *4 (6th Cir. 1997). Although *McKee* was unpublished, numerous circuits have recognized the same principle, concluding that, where an official is alleged to have "deliberately ignored a *known* threat or danger," the two qualified-immunity prongs "effectively collapse into one." *Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996); *see Thorpe*, 37 F.4th at 934; *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001); *Miller v. Solem*, 728 F.2d 1020, 1024-1025 (8th Cir. 1984). This Court should, too; after all, qualified immunity does not protect "those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In faulting Finley for not citing a case with near-identical facts, Defendants effectively argue "that only cases with fundamentally or materially similar facts can provide fair notice—a contention the Supreme Court has squarely rejected." *Baker*, 649 F.3d at 435. The

17

"operative inquiry" is whether it would be "clear to a reasonable officer that his conduct is unlawful," not whether plaintiffs "identify a case with completely analogous facts." *Rafferty v. Trumbull County*, 915 F.3d 1087, 1097 (6th Cir. 2019) (citation omitted).  Exact fact-matching is even less necessary in deliberate-indifference claims, which do not involve split-second decisions like excessive-force situations.  *See* Opening Br. 28-30.

Moreover, this Court has rejected the notion "that a legal duty need be litigated and then established disease by disease or injury by injury." *Murray v. Department of Corrs.*, 29 F.4th 779, 790 (6th Cir. 2022) (cleaned up).  *Comstock* recognized, based on decades of precedent, that deliberate indifference to a known risk that a prisoner might engage in "serious self-inflicted harm" violates the Eighth Amendment.  273 F.3d at 704.  It is irrelevant that the *Comstock* plaintiff's self-harm was asphyxiation while Finley's was swallowing razors, just as it is irrelevant that Finley's self-harm was not fatal.  If it is clear that Defendants cannot ignore a known risk a prisoner might engage in life-threatening self-injury, it is equally clear they cannot impose a condition that would *cause* the prisoner to engage in such serious self-harm.

18

### C. Accepting Finley's facts as true, the constitutional violation was obvious

Alternatively, this Court should deny qualified immunity because the constitutional violation was obvious. Just as "no reasonable correctional officer" could think it was "constitutionally permissible" to confine a prisoner for six days in cells "teeming with feces" or "frigidly cold," *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020), or handcuff a prisoner to a hitching post for seven hours in exposed sun, *Hope v. Pelzer*, 536 U.S. 730, 745 (2002), no reasonable officer could think that imposing a condition she knew would exacerbate a prisoner's mental decline and all but guaranteed he would undertake life-threatening self-harm was constitutionally permissible. Defendants did not need a case with near-identical facts to understand the violative nature of their conduct; the "obvious cruelty" inherent in their decisions was warning enough. *Ibid.*

Indeed, Defendants do not seriously contend otherwise. Although they assert cursorily (at 41-44) that Finley's case "does not rise to the extreme level of obviousness" in *Taylor* or *Hope*, their position, as with the rest of their argument, turns on this Court accepting their version of the facts and ignoring the most compelling parts of Finley's: that Defendants knew Finley was at risk of suicide, knew he had repeatedly

19

engaged in life-threatening self-harm when placed in solitary, and were specifically warned that consigning him to prolonged solitary was likely to deteriorate his mental health, but did it anyway. Defendants make no claim that, accepting Finley's version of the facts—as this Court must— the cruelty in their actions was not obvious.

Defendants' contention (at 41) that Finley forfeited his obvious-violation argument because he did not raise it before the magistrate judge is meritless.[22] Finley argued in his summary-judgment opposition that "the 'obvious cruelty' of a practice may provide fair warning" of a constitutional violation and that "the cruelty of" Defendants' conduct was "obvious" and thus provided them notice, citing *Hope*.[23] Finley reiterated that argument in his objections to the Report and Recommendations

---

[22] Although Defendants use the term "waiver," their argument is one of forfeiture. Forfeiture is the "failure to make the timely assertion of a right," whereas waiver is "the intentional relinquishment or abandonment of a known right." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1228 (6th Cir. 2022) (cleaned up). The distinction matters: appellate courts generally do not review waived claims but have discretion to overlook forfeiture. *Id.*

[23] MSJ Opp., R.88, PageID.579-583.

(R&R).[24] Finley did not cite *Taylor* in that briefing because *Taylor* had not been issued yet; it came out a week after Finley submitted his objections to the R&R. There is no forfeiture under these circumstances, especially where Defendants and the district court had full opportunity to address Finley's supplemental brief concerning *Taylor* below.[25] *See Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1228 (6th Cir. 2022).

## III. Defendants Are Not Entitled to Summary Judgment on Finley's Procedural Due Process Claim

### A. Determining whether a confinement condition imposed an atypical-and-significant hardship must consider the prisoner's individual vulnerabilities

Defendants do not dispute that Finley's serious mental illness made him uniquely vulnerable to the hardships posed by solitary confinement. Instead, Defendants assert (at 49) that *Austin v. Wilkinson*, 372 F.3d 346 (6th Cir. 2004), precludes courts in this circuit from considering a prisoner's particular vulnerabilities when assessing whether a confinement condition imposed an atypical-and-significant hardship. That is incorrect; *Austin* did not address this question. Several other

---

[24] R&R Objs., R.104, PageID.1650.

[25] Suppl. Br. Resp., R.111, PageID.1707-1713; Order, R.113, PageID.1719-1720.

21

circuits have, however, and have reached the eminently logical conclusion that assessing whether a condition imposes an atypical-and-significant hardship on a prisoner necessarily must account for the prisoner's individual vulnerabilities. This Court should do the same.

As explained in Finley's opening brief (at 40), *Austin* concerned the proper baseline against which to compare challenged conditions in an Ohio supermax facility: whether it be the "general prison population," "typical segregation conditions," or "other supermax facilities." *Id.* at 353. The Court was not asked to—and did not—consider whether the conditions being compared *against* the baseline can or should account for the prisoner's particular vulnerabilities. Defendants do not engage with this point at all, simply asserting, without support, that *Austin* forecloses the question.

While this Court has not squarely addressed this issue, four circuits have concluded that assessing whether a hardship is atypical or significant necessarily must account for the prisoner's unique vulnerabilities. *See* Opening Br. 40-42. Defendants call these cases "unavailing" (at 54) but do not explain why their reasoning is unpersuasive.

Nor can they, as the principle these cases espouse is intuitive and rational. After all, the question under *Sandin v. Connor* is whether the condition "imposes an atypical and significant hardship *on the inmate*." 515 U.S. 472, 484 (1995) (emphasis added). Thus, while "confinement in a non-handicapped-accessible administrative housing unit" may not pose an atypical-and-significant hardship for an able-bodied prisoner, it does for a prisoner with a disability deprived of his wheelchair. *Serrano v. Francis*, 345 F.3d 1071, 1078-1079 (9th Cir. 2003). To say a condition's severity must be determined in a vacuum, without regard to how it actually affects the prisoner, is artificial and illogical.

Moreover, as Finley noted in his opening brief (at 41), this Court has recognized that a plaintiff's "unique vulnerabilities" to "the harmful effects of solitary confinement"—there, youth and mental illness—must be considered in the substantive-due-process context. *J.H. v. Williamson Cnty.*, 951 F.3d 709, 718-719 (6th Cir. 2020). The question in substantive-due-process cases—whether an imposed condition is "excessive in relation to [its] purpose," *id*. at 717—is analogous to the atypical-and-significant hardship question. Both require the court to assess the severity of the condition imposed. Defendants fail to explain

23

why courts should "pretend that the effects of solitary confinement are the same regardless of a detainee's mental health status" in procedural-due-process cases when this Court has said they cannot do so in substantive-due-process cases. *Id.* at 720 n.2. Indeed, district courts in this circuit have treated *J.H.* as governing procedural-due-process claims. *See Blaylock v. Adams*, No. 2:22-cv-10831, 2022 WL 2079865, at *3 (E.D. Mich. June 9, 2022); *Haywood v. Winn*, No. 2:20-cv-12976, 2021 WL 1192975, at *4 (E.D. Mich. Mar. 30, 2021).

This Court should decline Defendants' invitation to create a circuit split and hold, consistent with four other circuits and this Court's substantive-due-process precedent, that analysis of whether a confinement condition imposes an atypical-and-significant hardship on a prisoner necessarily must consider the prisoner's particular vulnerabilities, such as mental illness.

### B. Prolonged, indefinite confinement in an MBP base cell was an atypical-and-significant hardship for Finley

Finley argued in his opening brief (at 41-43) that the extreme conditions he experienced for months—total isolation, no access to sunlight, denial of privileges, and an indefinite duration—would impose an atypical-and-significant hardship on any prisoner, but certainly on

24

someone with a serious mental illness, for whom the effects of solitary are magnified. Defendants do not address how those conditions affected Finley, arguing only (at 51) that "standard segregation conditions" are not atypical or significant in the abstract. Because a reasonable juror could conclude that confinement in MBP's extreme base cell was an atypical-and-significant hardship for Finley in light of his severe mental illness, that issue should go to a jury.

## C.    Finley did not receive the process he was due

Defendants urge (at 56) that Finley received process at his September 26 *misconduct* hearing. But the relevant hearing—the one that resulted in his reclassification to solitary—was the September 27 SCC hearing. Defendants make no argument that Finley received adequate process at *that* hearing, because they cannot: Finley received *no* notice of the SCC hearing until he was brought to it, depriving him of the opportunity to prepare a challenge to reclassification. Finley explained in his opening brief (at 44-45) why process at the misconduct hearing cannot substitute for process at the SCC hearing, which addresses a different question and involves different officials. *See Hewitt v. Helms*, 459 U.S. 460, 476 (1983) (prisoner must receive notice and an

25

opportunity to "present his views *to the prison official charged with deciding whether to transfer him to administrative segregation*" (emphasis added)).  Defendants offer no response.

As for the second SCC hearing on October 10, Defendants concede (at 57) that Finley was not permitted to attend but argue, relying entirely on Schroeder's self-serving deposition testimony, that the hearing "was scheduled in error" so "no process was due."  Because that issue turns on Schroeder's credibility, it cannot be resolved in Defendants' favor on summary judgment.  *CenTra*, 538 F.3d at 412.  Regardless, the hearing occurred and resulted in a written order that had effect; Finley was thus owed constitutionally adequate process at it, particularly given that he did not receive such process before being reclassified to solitary initially.

## D.    Finley's due process rights were clearly established

Defendants do not contest that Finley's right to procedural protections was clearly established but contend (at 58) that his liberty interest was not because he did not cite cases "binding on this Court."

Defendants misstate the standard.  It is well-established that out-of-circuit cases "can provide defendants with fair warning," even though they are "not binding on this Court."  *Barker*, 649 F.3d at 436.  Here, case

26

law from multiple circuits establishes that the atypical-and-significant-hardship analysis must consider the prisoner's individual characteristics. Ample case law—and MBP's own policies—also put Defendants on notice that solitary confinement is particularly detrimental to prisoners with serious mental illness. *See* Opening Br. 34-37. Defendants had fair warning that consigning a severely mentally ill and suicidal prisoner with a history of self-harm to indefinite confinement in an extreme MBP base cell would impose an atypical-and-significant hardship on him, triggering procedural-due-process protections.

## IV. Defendants Are Not Entitled to Summary Judgment on Finley's Disability-Discrimination Claims[26]

Defendants concede the first two elements of Finley's disability-discrimination claims. Accordingly, the sole question is whether Finley raised a triable issue on the third element: whether Defendants placed

---

[26] Finley did not forfeit his Rehabilitation Act (RA) claim. As explained in Finley's opening brief (at 49 n.7), RA claims are identical to Americans with Disabilities Act (ADA) claims except that in RA claims the discrimination must be *solely* because of disability. Because here analysis of both claims turns on the same question—whether Finley raised a genuine issue regarding whether his disability caused the behaviors underlying Defendants' reclassification decisions—they did not require separate development. *See Knox County v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023) ("Claims brought under the ADA and [RA] are generally evaluated together." (cleaned up)).

him in solitary *because of* his disability (intentional-discrimination claim) or failed to provide a reasonable accommodation (failure-to-accommodate claim).  The answer is yes to both.

### A. Finley raised a genuine issue regarding whether his disability caused the behaviors for which Defendants reclassified him to solitary

Defendants do not dispute the central premise of Finley's intentional-discrimination claim:  that discriminating against a prisoner because of behavior caused by his disability is discrimination *because of* that disability.  And for good reason:  that premise is logical and grounded in considerable case law.  *See* Opening Br. 51-52 (citing cases); *McMillan v. City of New York*, 711 F.3d 120, 129 (2d Cir. 2013); *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001); *Ward v. Massachusetts Health Research Inst., Inc.*, 209 F.3d 29, 38 (1st Cir. 2000).[27]

---

[27]  Defendants (at 65) dismiss the district court cases Finley cited because they were "decided on the pleadings" rather than summary judgment.  But the cases' posture doesn't undermine the principle they recognize: that discriminating against someone for behavior caused by a disability is discrimination *because of* disability.  *See, e.g., Robinson v. Cuyahoga Cnty.*, No. 1:22-cv-0961, 2022 WL 16793347, *4 (N.D. Ohio Nov. 8, 2022) (denial of access to jail services based on behavior caused by plaintiff's schizophrenia, if proved, would constitute discrimination because of that disability).  Defendants also (at 64-65) distinguish *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018), because it was an

Instead, Defendants argue (at 62) that Finley's behaviors for which they reclassified him to solitary—swallowing a razorblade and disobeying an order—were "not the result of his mental health," pointing to QMHP Salmi's testimony opining that Finley's behavior was "calculated to facilitate his placement in ICP" and within his control. But Finley disputed Salmi's opinion. Finley's psychiatric expert opined that his "serious acts of self-harm...were driven by his mental illness," and that it "is incorrect and very dangerous" to dismiss such acts "as a form of manipulation to win release from segregation."[28] Finley's penology expert likewise opined that Finley's self-harming reflected "decompensation" of his mental state and that his inability to comply

_____

employment case and the requested accommodation was "immediately accessible." But again, neither point undermines the proposition for which Finley cited *Dolgencorp*—that punishing someone for conduct caused by his disability is tantamount to punishing him for his disability. Because Titles I and II of the ADA both have a because-of element, courts' analysis of that element in Title I cases is relevant to Title II claims. *See Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015) (equating Title I and II's causation language); *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 460 (6th Cir. 1997) (Title I cases' "decisional principles" may be applied in Title II cases).

[28]  Kupers Decl., R.88-2, PageID.625-628.

29

with orders had a "clear nexus to his mental health."[29]  Finley himself stated both at the time and in his deposition that self-mutilation is "part of" his mental illness and something he had "no control over."[30]  And Salmi's own notes from the time observed that Finley self-harmed "to feel better," and none of the evaluations she or medical staff authored characterized Finley's actions as manipulative or malingering.[31]

A reasonable jury would be entitled to credit Finley's evidence over Salmi's opinion and conclude that his behavior of swallowing razorblades and disobeying orders were manifestations of his mental illness, not calculated acts within his control.  On summary judgment, that ends the matter: because there is genuine dispute over whether Finley's mental illness caused the behaviors for which Defendants sent him to solitary, that issue must go to a jury.  *See Ward*, 209 F.3d at 37-38 (reversing summary judgment where there was genuine dispute over whether

---

[29]  Pacholke Decl., R.88-3, PageID.674-675, 665.

[30]  Corr. Recs., R.88-6, PageID.752; Finley Dep., R.88-4, PageID.688, 696.

[31]  Med. Recs., R.88-5, PageID.723-731.

employee's tardiness, the basis for his termination, was caused by his disability); *Humphrey*, 239 F.3d at 1139-1140 (same).[32]

## B. Finley raised a genuine issue on whether Defendants failed to reasonably accommodate his disability

Finley's failure-to-accommodate claim should also go to trial. Defendants argue (at 66-67) that Finley's requested accommodation— prompt placement into ICP—would have posed an "undue administrative burden," citing Schroeder's testimony that others were ahead of Finley on the ICP waiting list. Defendants do not explain how moving Finley up in line would have posed any administrative burden, much less an "undue" one. Indeed, Schroeder testified that she had weekly discussions

---

[32] The SCC forms Defendants completed contemporaneously with the hearings make clear they reclassified Finley to solitary based entirely on the behavior underlying his misconducts—swallowing a razorblade and disobeying an order. (Corr. Recs., R.88-6, PageID.749-754; Schroeder Dep., R.88-10, PageID.831) An October 31, 2016, email confirmed that Finley's initial reclassification was based entirely on the misconduct for swallowing a razorblade. (Emails, R.88-18, PageID.887)

Defendants now assert (at 10-13, 61) that their decisions to relegate Finley to solitary were based on a host of other factors not documented on the SCC forms, including Finley's "previous misconducts" and "history of behavior." Because a reasonable jury could dismiss these after-the-fact justifications as self-serving, they may not be considered at summary judgment. Regardless, such bases, if credited, would defeat only Finley's RA claim, not his ADA claim, which does not require that the discrimination be based solely on disability. *See* n.26, *supra*.

31

with prison staff about moving prisoners up or down the list, indicating that accommodating Finley's request presented no administrative burden.[33]  At the very least, whether Finley's request was reasonable is a factual dispute that cannot be resolved at summary judgment.  *See Blanchet*, 27 F.4th at 1230-1232.  Defendants also do not contest, and therefore concede, that they could have easily accommodated Finley's mental illness by modifying the conditions of solitary while he awaited transfer.  Opening Br. 57; Appellees Br. 66-67.

### C. *McDonnell Douglas* does not apply to Finley's claims; regardless, Finley raised a genuine issue as to pretext

Finally, the district court erroneously applied the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to Finley's disability claims.  Defendants do not deny that *McDonnell Douglas* does not apply where there is direct evidence of discrimination but contend (at 63-64) that "[n]o such evidence exists" here because Defendants did not use "derogatory language" or make "negative statements" about Finley's mental illness.  Such statements, however, are neither necessary to prove intentional discrimination nor the only

---

[33] Schroeder Dep., R.84-7, PageID.491-492.

form of direct evidence; the ADA "speaks in terms of causation, not animus." *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 436 (6th Cir. 2018).

Here, the SCC forms show that Defendants' decision to reclassify Finley to solitary was based on the behaviors underlying his misconduct charges—swallowing a razorblade and disobeying an order. A jury would not have to draw any logical inferences to find this was tantamount to reclassifying him based on his mental illness—it would simply have to credit Finley's evidence that his mental illness *caused* those behaviors. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007); *McMillan,* 711 F.3d at 129 (where plaintiff's tardiness for which he was disciplined was "the direct result of [his] disability," *McDonnell Douglas* didn't apply; "[p]retext is not an issue in this case").

Even if *McDonnell Douglas* applied, Finley raised a genuine issue regarding whether Defendants' asserted non-discriminatory reason for assigning him to solitary—to restrict his access to razors—was pretextual given that placement in solitary had not prevented him from accessing razors previously. *See* Opening Br. 53-54. Indeed, Defendants do not claim otherwise—although they urge (at 65-66) that they "offered legitimate, nondiscriminatory reasons" for their decisions, they nowhere

33

contest Finley's argument that a reasonable jury could find those reasons pretextual. Accordingly, this Court should treat that issue as conceded.

Defendants' claim (at 62-65) that Finley "waived" these arguments because he did not raise them until objecting to the R&R is meritless. Finley did not make these arguments in response to Defendants' summary-judgment motion because Defendants did not contend that *McDonnell Douglas* applied—the magistrate judge applied it *sua sponte*.[34] Accordingly, it was not until responding to the R&R that Finley had occasion to raise these points.[35] That is not waiver. *Morgan v. Trierweiler*, 67 F.4th 362, 367-369 (6th Cir. 2023).

Moreover, Finley pled a failure-to-accommodate claim, which "necessarily involve[s] direct evidence" of discrimination. *Creech v. Ohio Dep't of Rehab. & Corr.*, No. 21-3722, 2022 WL 4138415, at *4 (6th Cir. Sept. 13, 2022) (cleaned up). Thus, Finley's reliance on a direct-evidence theory was clear from the outset. *See Blanchet*, 27 F.4th at 1227-1228

---

[34] MSJ, R.84, PageID.356-357; Reply to MSJ Opp., R.92, PageID.931-933; R&R, R.100, PageID.1619-1623.

[35] R&R Objs., R.104, PageID.1671-1675.

(doubting plaintiff forfeited direct-evidence argument where complaint encompassed a failure-to-accommodate claim).

## CONCLUSION

This Court should reverse and remand for further proceedings.

Dated: October 30, 2023                    Respectfully submitted,

                                           /s/ Christine A. Monta

Aaron Littman                              Daniel M. Greenfield
UCLA SCHOOL OF LAW                         Christine A. Monta
  PRISONERS' RIGHTS CLINIC                 RODERICK & SOLANGE
385 Charles E. Young Drive E                 MACARTHUR JUSTICE CENTER
Los Angeles, CA 90095                      501 H Street NE, Suite 275
(310) 925-9562                             Washington DC 20002
                                           (202) 869-3308
                                           christine.monta@macarthurjustice.org

*Counsel for Plaintiff-Appellant Timothy Finley*

35

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

1.    This Brief complies with type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Circuit Rule 32(b) because, according to the word count function of Microsoft Word 2019, the Brief contains 6,500 words excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

2.    This Brief complies with the typeface and type style requirements of Rule 32(a)(5) and (6) of the Federal Rules of Appellate Procedure and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook font for the main text and 14-point Century Schoolbook font for footnotes.

Dated: October 30, 2023                    */s/ Christine A. Monta*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2023, I electronically filed the foregoing document through the court's electronic filing system, and that it has been served on all counsel of record through the court's electronic filing system.

/s/ Christine A. Monta